A02A0909. BASS CUSTOM LANDSCAPES, INC. v. CUNARD.
(575 SE2d 17)

PHIPPS, Judge.

Judith L. Cunard sued Bass Custom Landscapes, Inc. for personal injuries incurred when she fell down ice-covered stairs located outside her place of employment. Cunard alleged that Bass had negligently performed its service contract by failing to properly maintain and operate the outdoor sprinkler system to prevent the system from discharging water onto the grounds, walkways, and parking surfaces during freezing weather, resulting in the creation of a hazardous condition. Bass sought summary judgment, primarily contending that Cunard had assumed the risk of injury. The trial court denied the motion. We granted Bass's application for interlocutory review and now affirm.

Summary judgment should be granted only when the moving party demonstrates the absence of any genuine issue of material fact and establishes that the undisputed facts, viewed in the light most favorable to the nonmoving party warrant judgment as a matter of

law.[1] When so considered, the record shows that on January 5, 1999, while dropping her children off at school and driving to work, Cunard did not see any ice. But, upon her arrival at the bank, at about 8:15 a.m., she noticed "a lot of ice" around the bank whose grounds resembled a "winter wonderland." Cunard recalled being careful as she proceeded toward the bank and trying to avoid the ice. Despite the hazardous conditions, she managed to walk up the ten steps from her parking spot without incident. When she was almost inside, she saw one of the tellers, Elaine Colbert, suddenly fall and receive help from another teller. After working on some of the night deposits, Cunard stopped to check on Colbert's leg which "was swelling." As teller coordinator and supervisor, Cunard was Colbert's immediate boss.

The branch manager, Keith Crusan, thought the sprinkler system had been disconnected but it apparently had discharged during the night. Crusan began undertaking prophylactic measures to remedy the danger. He testified that he was looking for salt to place on the ice and was in contact with the property management company. Although no one thought that Colbert's injury was a life-threatening emergency, several bank employees suggested that she have it examined.

Crusan and Cindy Burnham, the customer service manager, were Cunard's immediate supervisors. Crusan testified that "when I came in and looked at [her knee], it was swelling more, we decided we needed to go ahead and take her to the hospital to get checked." When asked, "[w]ho is we?" he responded, "[p]robably Cindy [Burnham] and I. Ultimately I guess it was my decision." Cunard testified that Crusan told her that he had to stay at the bank "to get the situation cleared up as best as possible before our customers got to the banking center, and Cindy [Burnham] had to stay because she was on the phone with workman's comp." Cunard testified, "I was asked — I was told that a supervisor had to take Elaine [Colbert] to the hospital." When asked, "So when [Crusan] told you that a supervisor needed to take Elaine [Colbert] to get medical treatment, did he tell you you're it?" she responded, "[y]es." When asked, "[w]hat was your response to [Crusan when he told you to take Colbert to the hospital]?" she said, "I asked him if he wanted me to take her then, and he said yes." She added, "he told me to go get my car and pick her up."

Cunard testified that when Crusan told her to take Colbert to the hospital, she believed the situation was an emergency in that "she was genuinely hurt. [H]er leg was swelling. To me, . . . that's an emergency. She was hurting." According to Cunard, after he told her to go get her car, he "just told me to be careful." She admitted that

---

[1] *Mayhue v. Middle Ga. Coliseum Auth.*, 253 Ga. App. 471, 472 (599 SE2d 488) (2002).

she knew it was dangerous to cross the ice and conceded that she did not protest or question her supervisor's instruction to take Colbert to the hospital.

While going to get her car, halfway down the steps, Cunard suddenly slipped, landed at the bottom of the stairwell, and injured her back and neck. She testified that when she fell down the concrete steps, she was using the handrail and knew that the steps were icy and slick. As a result of her fall, she underwent neck fusion surgery.

In seeking summary judgment, Bass claimed that Cunard "knew about the icy conditions before she elected to risk them again," and failed to exercise ordinary care for her own safety. Bass argued that her fall "resulted from a defective and unsafe condition of the premises of which she was aware."

The trial court determined that material issues of disputed fact remained for jury resolution and denied the motion. Specifically, the trial court found that a jury should decide "whether plaintiff voluntarily acted to take her injured co-worker to the hospital and whether or not she assumed the risk of injury."

1. Bass contends that the trial court misconstrued the law on the doctrine of assumption of risk. In essence, Bass argues that Cunard assumed the risk of injury, as a matter of law, by knowingly walking upon a slippery, ice-covered stairway, and that her assumption of that risk was not excused by the branch manager telling her to get her car and take the injured employee to the hospital. But, when the controlling law is applied to the undisputed facts, the result is not so straightforward.

"Generally, whether a plaintiff assumed the risk of injury is an issue for the jury. [Cit.]"[2] Moreover,

> [i]ssues of negligence, including the related issues of assumption of risk, lack of ordinary care for one's own safety, lack of ordinary care in avoiding the consequences of another's negligence and comparative negligence, are ordinarily not susceptible of summary adjudication but must be resolved by a trial in the ordinary manner, except where the facts are so plain and palpable that they demand a finding by the court as a matter of law.[3]

This is not such a case.

To prevail on the affirmative defense of assumption of risk, a defendant "must establish that the plaintiff (1) had actual knowledge

---

[2] *Henderson v. Lowe's Home Centers*, 234 Ga. App. 573, 574 (507 SE2d 159) (1998).

[3] (Citations and punctuation omitted.) *Gen. Tel. Co. &c. v. Hiers*, 179 Ga. App. 105, 107 (345 SE2d 652) (1986).

of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed [her]self to those risks."[4] "Exposure to the known risk must be voluntary, the result of a deliberate choice."[5] And, the defense of "[a]ssumption of risk assumes that the actor, without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice . . . whether to engage in the act or not."[6]

In *Russell v. Superior K-9 Svc.*,[7] an employee volunteered to undertake a task outside of her normal job duties and at her own request. In so doing, she was injured. This Court found that the defendant was entitled to a jury charge on assumption of risk in light of the uncontroverted evidence that the injured employee had volunteered to let a trained attack dog out of his pen the night she was attacked and that she knew Rocky was a guard dog and not a pet.[8] In *York v. Winn-Dixie*, we found that jury issues remained whether an employee had exercised his free choice to undertake the activity that resulted in his injury or whether that choice was restricted by the coercion of combined circumstances.[9]

Absent the combination of circumstances here, the injured plaintiff had no reason to leave the safety of the bank. And, unlike the injured employee in *Russell*, supra, who asked her supervisor if she could let the guard dog out of his pen, Cunard did not ask to encounter the danger.[10] In fact, she testified, "I would not have chosen to leave the bank building at that time but for my boss telling me to do so and the fact that my co-worker was hurting." Bass, who bears the burden of proving this affirmative defense, has offered no evidence to the contrary.[11]

The branch manager, Cunard's supervisor, testified that the decision "we needed to go ahead and take her to the hospital to get checked," was ultimately his. In these circumstances, we find that a jury should determine whether Cunard chose a course of action with

---

[4] (Footnote omitted.) *Vaughn v. Pleasent*, 266 Ga. 862, 864 (1) (471 SE2d 866) (1996).

[5] (Citations omitted.) *York v. Winn-Dixie Atlanta*, 217 Ga. App. 839, 840 (459 SE2d 470) (1995).

[6] (Citation and punctuation omitted.) *Mann v. Anderson*, 206 Ga. App. 760, 763 (2) (426 SE2d 583) (1992).

[7] 242 Ga. App. 896 (531 SE2d 770) (2000).

[8] Id. at 898 (2).

[9] See *York*, supra at 841.

[10] *Russell*, supra at 896.

[11] See *Vaughn*, supra at 864 (1) (assumption of risk is an affirmative defense). See, e.g., *Clemmons v. Smith*, 246 Ga. App. 643, 644 (1) (540 SE2d 623) (2000) (defendant relying upon assumption of risk defense entitled to jury charge where evidence showed that plaintiff chose to park his car in the left lane of a busy highway, on a bridge, following a blind curve, to protect another stopped vehicle and its driver).

full knowledge of its danger and while exercising a free choice whether to engage in the act or not.[12]

2. Bass asserts that the trial court erred in finding that a jury must determine whether Cunard assumed the risk of walking across an ice-covered parking lot despite her admission that she did not think any adverse employment action would be taken against her if she questioned her supervisor's instruction. Bass claims that evidence of the element of "coercion of circumstances" is lacking when *Prophecy Corp. v. Charles Rossignol, Inc.*[13] is applied. We do not agree.

Under the *Prophecy Corp.* rule, a party must offer "a reasonable explanation" for her self-contradictory, vague, or equivocal testimony or it will be construed most strongly against her.[14] But the opposing party is entitled to judgment only when the party's self-contradictory testimony is the *sole* evidence of her right to recover or of her defense.[15] Whether a reasonable explanation for the testimony has been offered presents an issue of law for the trial court whose decision will be upheld unless it is clearly erroneous.[16]

Here, Bass argues that Cunard's affidavit testimony contradicts her deposition testimony on the issue of whether she was coerced by the circumstances to risk walking on the ice. Bass complains that Cunard offered no reasonable explanation for her inconsistent testimony whether she believed that she would be fired if she did not comply with her supervisor's instruction.

By affidavit, Cunard testified that "[a]s Mr. Crusan was manager of the branch, I did not feel comfortable in challenging his order to go get my car." She added, "[a]t that time, I had concern not only for Elaine Colbert and her injured leg, but also that my employment with the bank would be jeopardized by my failure to obey my supervisor in the emergency situation created by Elaine Colbert's injury."

Later, upon deposition, she again expressed concern about her job performance. During cross-examination, this colloquy transpired.

DEFENSE COUNSEL: At the time were you afraid if you did not take her that he would fire you?
CUNARD: He was my direct supervisor and he told me I needed to take her, so I did.
DEFENSE COUNSEL: Were you afraid he would fire you if you did not take her?

---

[12] Compare *Muldovan v. McEachern*, 271 Ga. 805, 807-808 (2) (523 SE2d 566) (1999).
[13] 256 Ga. 27 (343 SE2d 680) (1986).
[14] See *Anglin v. Harris*, 244 Ga. App. 140, 142 (1) (534 SE2d 874) (2000).
[15] *Korey v. BellSouth Telecommunications*, 269 Ga. 108, 109 (498 SE2d 519) (1998).
[16] *Rhodes v. ABC School Supply*, 223 Ga. App. 134, 136 (1) (476 SE2d 773) (1996).

CUNARD: I am not sure how to answer that.

DEFENSE COUNSEL: And I don't know how to make that question any more straightforward.

CUNARD: When he directly told me I needed to take her and he was my supervisor — I mean, that's my job performance.

DEFENSE COUNSEL: Were you afraid that he would fire you if you did not take her and proffered a legitimate excuse for your reason not to take her?

CUNARD: Just that it was my job performance. I don't know that if I had the thought, if I don't, I am going to get fired.

Later, this exchange took place.

DEFENSE COUNSEL: . . . when Keith [Crusan] said to you that you need to take her to the hospital, you actually never had a thought in your mind that if I don't do it, I am going to get fired; that thought never crossed your mind, did it?

CUNARD: I just thought he was telling me to do it, so I did.

DEFENSE COUNSEL: And the thought that if you didn't do it, he would fire you or take some adverse employment action against you never entered you mind, did it?

CUNARD: No, I don't believe so.

But the final question is obviously compound, blurring the distinction between being fired and having some adverse employment action taken. Cunard never testified in her affidavit that she feared she would be fired. On the contrary, both in her affidavit and in her deposition, she expressed concern that a failure to cooperate would negatively impact her job performance. In other words, Cunard consistently testified that she did not believe she would be fired and also consistently expressed concern about the negative effect on her job performance. At this point, the meaning of the phrase "some adverse employment action" merely affords fodder for additional cross-examination.[17] Whether Cunard voluntarily and "without coercion of circumstances" exposed herself to the risk and how much "free choice" she had in proceeding back down the icy steps remain material issues of disputed fact. Having considered all of Cunard's testimony including both depositions in which she was cross-examined by four different defense lawyers, we find, as did the trial court, that her subjective response to the situation — i.e., whether "without coercion

---

[17] See *Cornelius v. Hutto*, 252 Ga. App. 879, 882 (1) (558 SE2d 36) (2001).

of circumstances" she was "exercising a free choice . . . whether to engage in the act or not" should be resolved by the factfinder.[18]

As a final matter, we note that the dissent has cast Cunard's testimony in a different light. But, as a general rule, conflicts in testimony, except for unexplained contradictory testimony, simply create questions better left for jury resolution. Where reasonable minds can disagree in interpreting the meaning of a party's testimony, as here, adjudication by summary judgment is inappropriate.

*Judgment affirmed. Blackburn, C. J., Johnson, P. J., Smith, P. J., Miller and Mikell, JJ., concur. Andrews, P. J., dissents.*

ANDREWS, Presiding Judge, dissenting.

Because I believe Bass Custom Landscapes, Inc. was entitled to summary judgment based on Cunard's assumption of the risk of walking across an ice-covered parking lot, I respectfully dissent.

In addition to the facts stated in the majority opinion, the following facts are important.

The record shows that Cunard was, and still is, employed as a teller coordinator at a bank in Forsyth. When Cunard arrived for work on January 5, 1999, she noticed a "lot of ice" on the bank's grounds, which looked like a "winter wonderland." After parking in her usual spot in the lower parking lot, Cunard saw ice on the asphalt as soon as she exited her car. She surmised that the bank's sprinkler system, which is maintained by Bass, must have come on during the night and that the water must have frozen.

Cunard walked across the icy, slippery parking lot to a sidewalk, which also was covered with ice. According to Cunard, ice was everywhere and was impossible to avoid. At the end of the sidewalk, Cunard climbed ten steps to a driveway which led to the bank's entrance. At the top of the steps, Cunard saw Elaine Colbert, a bank teller, walking to the drive-up window. Cunard and Colbert talked briefly about the ice and how "everybody had to be careful." Colbert then slipped and fell on the ice. Another employee arriving for work helped Colbert into the building.

Once inside, Cunard told the bank's senior manager, Keith Crusan, that Colbert was injured. Crusan and another manager were "discussing that the sprinkler system had gone off overnight and had frozen." Cunard then checked on Colbert, whose leg was swelling and bleeding slightly. Cunard and other bank employees told Colbert that she "might want to get it checked out." Colbert testified that she "didn't feel like it was anything, but better safe than sorry." Cunard

---

[18] See *Russell*, supra.

testified that she did not believe Colbert faced an emergency situation requiring immediate attention.

According to Cunard, Crusan told her to take Colbert to the hospital. She asked Crusan if he wanted her to do it then, and he said yes. Cunard admitted that she knew it was dangerous to return to her car across the ice, but she did not protest or question Crusan's instruction to take Colbert to the hospital, and she never hinted or suggested that she did not want to comply.

Cunard returned to her car along the same path she had taken into the bank. As she was descending the steps to the lower parking lot, she slipped and fell, injuring her neck and back.

The affirmative defense of assumption of the risk precludes recovery when the evidence shows that the plaintiff, without coercion of circumstances, freely chose a course of action with full knowledge of its danger. *Jekyll Island State Park Auth. v. Machurick*, 250 Ga. App. 700 (1) (552 SE2d 94) (2001). The defendant is entitled to summary judgment based on the plaintiff's assumption of the risk if plain, palpable, and undisputed evidence shows that the plaintiff (1) had actual knowledge of the danger and (2) understood and appreciated the risks associated with the danger, yet (3) voluntarily exposed herself to those risks. Id. at 700-701.

Cunard does not deny that she knew about the ice and understood and appreciated the danger of traversing it. She argues, however, that Bass cannot establish the third element of its assumption of the risk defense because there is a factual dispute as to whether she was coerced into facing the risk.

Cunard relies on a series of cases in which this Court recognized that the circumstances of a person's employment can constitute coercion sufficient to defeat an assumption of the risk defense. In *Kitchens v. Winter Co. Builders*, 161 Ga. App. 701 (289 SE2d 807) (1982), a construction worker sued a general contractor for personal injuries he incurred when he fell from a slippery ladder at the job site. The contractor sought summary judgment on the basis of assumption of the risk. This Court held that summary judgment was not appropriate, even though the worker knew the ladder was dangerous, because "[t]here was no safer alternative" to ascending the ladder and "there was an emergency whereby . . . the need for haste to repair collapsing forms required immediate action without allowance for a process of weighing risks and benefits on the part of the plaintiff." Id. at 703 (1).

In *York v. Winn-Dixie Atlanta*, 217 Ga. App. 839 (459 SE2d 470) (1995), a worker whose employer had told him to deliver a load of fish to Winn-Dixie "immediately" found that the loading dock was seven to ten feet higher than the bed of his truck. The worker complained to the warehouse supervisor, who said, "I don't want to talk to you. Just

get the damn fish off the truck and leave." (Punctuation omitted.) Id. The supervisor also said that there was no other place to unload the fish. While unloading the fish, the worker was injured, and he sued Winn-Dixie and another defendant. We held that the defendants were not entitled to summary judgment on their assumption of the risk defense because there was a jury question whether "the circumstances presented a practical choice" to the worker. Id. at 840.

Finally, in *Styles v. Mobil Oil Corp.*, 218 Ga. App. 48 (459 SE2d 578) (1995), a construction worker sued for injuries he sustained after falling from an icy steel beam. The defendant claimed that the worker assumed the risk of walking on the beam. The worker, however, testified that he discussed the danger with his supervisor, who said, "I cannot tell you to go up there, but we'll get somebody who can." (Punctuation omitted.) Id. at 49 (1). The worker interpreted the supervisor's comment as a threat to walk on the beam or be fired. The worker also testified that he knew of other employees who had been fired for "being a little too safe." (Punctuation omitted.) Id. Under these circumstances, this Court correctly held that there was a factual dispute whether the worker exercised a free choice to walk on the beam, unrestricted by coercion or intimidation.

Cunard asserts that she was coerced into traversing the ice outside the bank a second time because her supervisor directed her to take Colbert to the hospital. She submitted an affidavit in opposition to summary judgment averring that she "did not feel comfortable in challenging [Crusan's] order to go get my car" and that she was concerned that her "employment with the bank would be jeopardized" if she did not do so.

Cunard's subsequent deposition testimony, however, paints a different picture:

Q. At the time were you afraid if you did not take [Colbert] that [Crusan] would fire you?
A. He was my direct supervisor and he told me I needed to take her, so I did.
Q. Were you afraid that he would fire you if you did not take her?
A. I am not sure how to answer that.
Q. And I don't know how to make that question any more straightforward.
A. When he directly told me I needed to take her and he was my supervisor — I mean, that's my job performance.
Q. Were you afraid that he would fire you if you did not take her and proffered a legitimate excuse for your reason not to take her?

A. Just that it was my job performance. I don't know that if I had the thought, if I don't, I am going to get fired.

. . .

Q. And I understand that when . . . [Crusan] said to you that you need to take [Colbert] to the hospital, you actually never had a thought in your mind that if I don't do it, I am going to get fired; that thought never crossed your mind, did it?
A. I just thought he was telling me to do it, so I did.
Q. And the thought that if you didn't do it, he would fire you or take some adverse employment action against you never entered your mind, did it?
A. No, I don't believe so.

In addition, Cunard testified that she was not afraid of Crusan, that he was open to suggestions as a manager, that she had made suggestions to him in the past, that their working relationship was good, and that he had never threatened to take any adverse employment action against her. In fact, Crusan had promoted Cunard from teller to teller coordinator about six months before the morning in question. Finally, Cunard admitted that nothing prevented her that morning from telling Crusan that she was afraid of going back out on the ice.

Despite the majority's attempt to demonstrate otherwise, there is a clear conflict between Cunard's statement in her affidavit that she felt her employment with the bank would be jeopardized if she did not obey Crusan's command and her deposition testimony that she never thought he would take adverse employment action against her if she did not comply. Because Cunard has failed to explain this conflict, it must be resolved against her by "eliminat[ing] the favorable portions of the contradictory testimony." (Citation, punctuation and emphasis omitted.) *Wright v. JDN Structured Finance*, 239 Ga. App. 685, 686 (1) (522 SE2d 4) (1999).

Eliminating Cunard's favorable affidavit testimony removes any evidence of coercion by her supervisor. Cunard argues that her deposition testimony that she thought taking Colbert to the hospital was part of her "job performance" shows that she felt coerced. Without more, however, Cunard's unelaborated reference to "job performance" does not establish that she believed her job would be negatively affected by refusing or questioning her supervisor's request. And any such inference collapses in light of her deposition testimony that she did not believe her supervisor would take adverse employment action against her if she refused his request.

Even if Cunard did subjectively believe that her job would be jeopardized if she did not go back across the ice, no objective facts support this belief. There is no evidence here, as there was in *Styles*, supra at 48, that Crusan ever directly or indirectly threatened Cunard's job if she did not comply. Nor was there any evidence, as there was in *York*, supra at 839, that Cunard pointed out the danger to her supervisor but was met with hostility. Rather, the evidence here shows that Cunard enjoyed a good working relationship with Crusan and was not afraid to voice concerns to him.

Finally, unlike in *Kitchens*, supra at 701, there is no evidence that Cunard was coerced by an emergency situation that required immediate action. Instead, the evidence showed that a co-worker had suffered a minor injury and was not in acute distress. Thus, Cunard had the opportunity to assess alternatives that were safer than going back across the icy path to her car.

Because the undisputed facts do not show that Cunard was coerced into assuming the risk of traversing the ice, I believe that the trial court erred by denying summary judgment to Bass.

DECIDED NOVEMBER 7, 2002 —
RECONSIDERATION DENIED NOVEMBER 27, 2002 

*Jones, Cork & Miller, W. Kerry Howell*, for appellant.
*McKenney, Jordan & Carey, John D. Carey*, for appellee.