**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 17, 2016**

# In the Court of Appeals of Georgia

A16A1209. TRAVIS v. QUIKTRIP CORPORATION et al.

MCMILLIAN, Judge.

On July 12, 2011, Harold Travis, who was employed as a tanker driver for Petroleum Transport Company ("PTC"), was delivering a load of gasoline to a QuikTrip Corporation ("QT") gas station managed by Lloyd Thompson (the "Station") when he was struck by a vehicle driven by Jose Leon. Travis brought suit against, inter alia, Leon,[1] QT, and Thompson seeking to recover medical expenses, lost wages, and other damages resulting from the collision. The trial court subsequently granted summary judgment to QT and Thompson, and Travis appeals. We reverse for the reasons set forth below.

---

[1] Travis has settled his claims against Leon.

"Summary judgment is proper when there is no genuine issue of material fact as to any essential element of a claim and the movant is entitled to judgment as a matter of law." (Citation omitted.) *Word of Faith Ministries, Inc. v. Hurt*, 323 Ga. App. 296, 296 (746 SE2d 777) (2013). In reviewing the grant of summary judgment, we consider the evidence de novo, viewing the evidence and all reasonable conclusions and inferences to be drawn from it in the light most favorable to Travis, as the nonmovant. Id.

So viewed, the evidence shows that on the date of the collision, Travis parked his tanker truck at the Station in the area for delivering gasoline, placed three orange traffic cones near the truck, and entered the Station store to input information about his delivery into a computer and obtain a printout of the information.[2] After receiving the initial printout, Travis exited the store to "stick the tanks" (i.e., to measure the Station's underground tank levels with a long stick) and to process his delivery. The Station was a "remote drop" location, which meant that the delivery or drop points for putting the gasoline into the underground tanks were positioned to the left of the store building, while the caps that allowed access for sticking the tanks were in

_____

[2] The applicable procedure required that Travis re-enter the store after his delivery and obtain another computer report reflecting the new tank levels.

2

another location, in the parking spaces immediately in front of the store and to the left of the store entrance (the "Tank Area"). Travis moved one of the cones from around his truck to the Tank Area while he stuck the tanks, then moved back to his truck, taking the cone with him, and delivered the gasoline.

At the pertinent time, QT policy required drivers to stick the tanks both before and after the delivery of gasoline, so Travis went back to the Tank Area to stick the tanks a second time in order to check the new fuel levels. He again took a cone with him and placed it in the area. While Travis was sticking the tanks, he dropped a tank cap into the well of the tank. He then got on his hands and knees to retrieve the cap. As Travis stretched his hand inside the tank to reach the cap, Leon backed his vehicle into Travis.

Prior to this incident, during meetings with PTC and QT personnel, Travis and his co-workers had reported that they had experienced "close calls" with automobiles while delivering gasoline to remote drop QT locations such as the Station. Travis stated that he had also placed QT on notice that its requirement that drivers stick the tanks was unnecessary and duplicated the computerized monitoring of the tanks. Nevertheless, at the time of the incident in this case, QT maintained its policy of requiring delivery drivers to manually stick the tanks twice, and Travis testified that

3

prior to the incident in this case, "a couple of [drivers] got fired on the spot" for failing to follow this policy.

Travis's complaint asserted claims against QT and Thompson based on premises liability, negligent hiring, and/or negligent supervision. QT and Thompson moved for summary judgment on Travis's claims, initially arguing that they were entitled to summary judgment because QT qualified as a statutory employer of Travis, affording them the protections of the exclusive remedy provision of the Workers' Compensation Act. See OCGA § 34-9-11. Six months later QT and Thompson filed a supplemental brief arguing that they were also entitled to summary judgment because Travis had equal or superior knowledge of any purported hazard leading to the collision and further that the nature of Travis's work changed the character for safety of the Station, thus falling within an exception to the safe workplace rule set out in OCGA § 51-3-1.

Five days after this supplemental brief was filed, the trial court signed an order denying the motion for summary judgment based on a finding that QT did not qualify as a statutory employer of Travis, but the order did not address the arguments raised in the supplemental brief. In response, QT and Thompson filed a motion for reconsideration reasserting these arguments. Following a hearing, the trial court

4

granted the motion for reconsideration and the motion for summary judgment, finding that Travis had equal or superior knowledge of any alleged hazard involved in sticking the tanks at the Station, as any alleged hazard was open, obvious, and well known to Travis and other PTC drivers.

Travis argues that the trial court erred in deciding the issues in this case as a matter of law instead of submitting them to the jury. In particular, he asserts that the trial court erred in finding (1) that his knowledge was greater than or equal to QT's and Thompson's; (2) that this case involved a static dangerous condition and not what he terms a "dynamic" one; and (3) that he assumed all the risks of the usual and ordinary hazards of his employment as well as any special risks and that he was not coerced into sticking the tanks.

1. Under OCGA § 51-3-1, a person who owns or occupies land and "by express or implied invitation, induces or leads others to come upon his premise for any lawful purpose, . . . is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." In order to recover on a premises liability claim, a plaintiff must show "(1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or

conditions within the control of the owner/occupier." *Robinson v. Kroger Co.*, 268 Ga. 735, 748-49 (2) (b) (493 SE2d 403) (1997). Thus, it is well settled in Georgia that "the fundamental basis for an owner or occupier's liability [is] that party's superior knowledge of the hazard encountered by the plaintiff." Id. at 736 (1). See also *McDonald v. West Point Food Mart, Inc.*, 332 Ga. App. 753, 754 (774 SE2d 774) (2015) (physical precedent only). Stated another way, a plaintiff is not entitled to recovery if "the undisputed evidence demonstrates that the plaintiff's knowledge of the hazard was equal to or greater than that of the defendant." *Norman v. Jones Lang LaSalle Americas, Inc.*, 277 Ga. App. 621, 624 (627 SE2d 382) (2006).

The undisputed evidence in this case demonstrates that Travis, QT, and Thompson[3] all had knowledge that the placement of the tanks at the Station presented a potential hazard because it put tanker drivers into the flow of any traffic pulling in and out of the parking area where the tanks were located. Travis stated that he had made deliveries to the Station, as well as to other QT remote drop locations, for a period of five to six years. In response to a deposition question on whether he had

_____

[3] Thompson has pointed us to no evidence establishing that he was somehow unaware of the potential danger of the tanks' placement in the parking area near the front of the store, where cars moved in and out. Therefore, for purposes of summary judgment, Thompson, as manager of the Station, must be charged with knowledge of the hazard.

previously had close calls with cars at the Station, Travis replied, "Yeah. I mean, at any remote drop [location] you're almost being hit, because you're in the flow of traffic. So, I don't know when I'm gonna get hit or who's gonna hit me, but of course." Travis and his fellow employees reported these prior close calls in the meeting with QT representatives, in which they discussed "how dangerous it was at the remote drops for sticking the tanks because we have to go in the flow of traffic, go in a parking area to stick the tank."

Thus, we find that Travis had at least equal knowledge of the potential danger involved in sticking the tanks at the Station's remote drop location. However, our analysis does not end with this finding,[4] because any potential danger arose from exposure to the risk of negligent actions by third parties. And, indeed, Travis's

---

[4] Compare, e.g., *Forest Cove Apts., LLC v. Wilson*, 333 Ga. App. 731, 733-34 (776 SE2d 664) (2015) (where plaintiff reported hazard to defendant, her "at least equal knowledge" of hazard entitled defendant to summary judgment); *Norman*, 277 Ga. App. at 627-28 (2) (a) (defendant entitled to summary judgment where plaintiff had actual knowledge of an open and obvious hazardous condition for two months before injury and thus failed to establish that defendants' knowledge was superior); *Walters v. Mableton Wholesale Co., Inc.*, 204 Ga. App. 663 (420 SE2d 354) (1992) (defendant entitled to summary judgment on claims arising from his fall from dangerous ramp where plaintiff was aware of ramp's condition and, in fact, had informed his employer that he did not believe the ramp was safe).

injuries in this case arose directly from the allegedly negligent actions of a third party in backing his car into Travis.

This Court addressed an analogous scenario in the case of *O'Steen v. Rheem Manufacturing Co.*, 194 Ga. App. 240, 240 (390 SE2d 248) (1990). There, the plaintiff, who was employed by defendant, was driving on a side road in the company's parking lot when a car driven by another employee entered the road in which she was traveling, causing a collision. The plaintiff alleged that the defendant had created a hazardous condition in the parking lot by allowing large trucks to be parked where they blocked the view of the intersection where the accident occurred. Id. Thus, the plaintiff, like Travis, alleged that her injury resulted from the landowner's creation of a hazard that increased the risk of her injury from third parties.

This Court applied the superior/equal knowledge rule in *O'Steen*, explaining that the rule "presumes the plaintiff, knowing of the danger, could have avoided the consequences of defendant's negligence with the exercise of ordinary care." (Citation and punctuation omitted.) 194 Ga. App. at 242 (1). Thus, the Court found that the rule applied in those cases "where the proprietor allows a dangerous condition to exist,

8

including cases where the alleged dangerous condition is one created by the activities of third persons," but only

> so long as the condition is one which the invitee[5] can expect equally with the host, or come to know of, and therefore must anticipate the danger. In other words, the condition even if created by third parties must be such that the invitee can indeed have equal knowledge and either *assumes the risk* or *can avoid the danger with ordinary care*.

(Citation and punctuation omitted; emphasis supplied and in original.) Id. In other words, "[t]he 'equal knowledge rule' . . . is the practical application of a rule that a knowledgeable plaintiff cannot recover damages if by ordinary care he could have avoided the consequences of defendant's negligence. OCGA § 51-11-7." (Punctuation omitted.) Id.

This Court concluded under the facts in *O'Steen* that the plaintiff had an obligation to approach the blind intersection in a fashion that enabled her "to determine visually that the intersection, to as near an absolute certainty as possible, was clear," and "absent disciplined habits on the driver's part," any actions by the

---

[5] "OCGA § 51-3-1 defines an invitee as one who is induced by an express or implied invitation to enter the premises of another," *Edmunds v. Copeland*, 197 Ga. App. 292, 293 (398 SE2d 280) (1990), which definition encompasses Travis in this case, as he was invited on the property to deliver gas.

9

employer could not have prevented the injury. 194 Ga. App. at 243. Therefore, the trial court determined that the plaintiff, having knowledge of the dangerous intersection, failed to exercise ordinary care for her safety as a matter of law.

However, to bar a plaintiff's recovery, "[e]xposure to the known risk must be voluntary, the result of a deliberate choice." (Citation and punctuation omitted.) *Bass Custom Landscapes, Inc. v. Cunard*, 258 Ga. App. 617, 620 (1) (575 SE2d 17) (2002). "And, the defense of assumption of risk assumes that the actor, without coercion[6] of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice whether to engage in the act or not." (Citation and punctuation omitted.) Id. at 620-21 (1). Although the plaintiff in *O'Steen* had a choice in how she approached the intersection, evidence in the record indicates that Travis was in the Tank Area only because QT policy required him to be there, and his employment was subject to termination if he failed to follow this policy. Although it is unclear whether QT or Travis's employer, or both, had the authority to fire him for failing to follow the policy, "[c]oercion which prevents the application of the assumption of risk defense need not come solely from the

---

[6] In this context, coercion means "'(t)o compel by force or threat.' Black's Law Dictionary (9th ed. 2009)." *Smith v. NT Nails, LLC*, 331 Ga. App. 98, 99 (770 SE2d 646) (2015).

defendant." *York v. Winn-Dixie Atlanta, Inc.*, 217 Ga. App. 839, 841 (459 SE2d 470) (1995).

Therefore, Travis was presented with the untenable choice of placing himself at risk of the traffic flow or risking the loss of his job. Id. Moreover, Travis had voiced his displeasure that the policy subjected him to risk and had unsuccessfully lobbied to have the policy changed. Under these circumstances, we cannot say as a matter of law that Travis's conduct in placing himself in the Tank Area was unreasonable or that he voluntarily assumed the risk of the traffic flow. See *Cunard*, 258 Ga. App. at 620 (question of fact arose regarding issues of assumption of risk and coercion where plaintiff, who was ordered by her supervisor to drive a co-worker to the hospital, slipped and fell on icy steps, even though she was aware of the icy conditions from safely negotiating them earlier); *York*, 217 Ga. App. at 841 (deliveryman's "Hobson's choice of facing a slippery high platform forced on him by the customer/defendant or facing his employer with the undelivered fish" he had been ordered to transport precluded a finding as a matter of law that he assumed the risk of traversing the platform); *Kitchens v. Winter Co. Builders, Inc.*, 161 Ga. App. 701, 702 (289 SE2d 807) (1982) (defendant employer not entitled to summary judgment on the ground that the plaintiff, who was aware of a defective ladder's danger and had

complained to his supervisors about it, assumed the risk of any danger by continuing to work with the ladder and not refusing to work).

Thus, we find that QT and Thompson failed to establish that they were entitled to summary judgment under the superior/equal knowledge rule.[7]

2. Similarly, we find that QT and Thompson failed to establish that they were entitled to summary judgment under an exception to the requirement under OCGA § 51-3-1 that landowners exercise ordinary care to keep their premises safe for invitees. That exception applies "to workers hired to perform work which makes a place that is known to be dangerous, safe, or in a work that in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses." (Citation and punctuation omitted.) *Elsberry v. Ivey*, 209 Ga. App. 620, 621 (434 SE2d 158) (1993). QT and Thompson assert that the parking lot itself is not a dangerous place. Instead, they argue that any alleged danger applies only to fuel delivery drivers while delivering fuel and sticking the tanks and that the drivers

[7] We further note that the evidence shows at the time Leon's car struck Travis, Travis was not in a standing position sticking the tank but was instead on his hands and knees retrieving the interior tank cap, which he had dropped into the tank's well. The evidence further shows that he was struck from behind, suggesting that he may have had his back to the traffic flow, raising a number of factual issues regarding assumption of risk.

12

assume any and all risks of associated with those job requirements, citing, e.g., *Long Leaf Industries, Inc. v. Mitchell*, 252 Ga. App. 343, 344 (556 SE2d 242) (2001) ("an employee or contractor assumes all the usual and ordinary hazards of his business and is bound to use skill and diligence to protect himself. He also assumes any special risk which is known to him or which is so obvious that a reasonably prudent man would observe and appreciate it.") (citation and punctuation omitted).

Pretermitting whether the act of delivering gas could affect the Station's character for safety as it relates to the injuries suffered by Travis, this case addresses QT's unique requirement that drivers manually stick the tanks and the placement of the tank access in the Station's active parking area. These conditions were created by QT and are not conditions inherent in the work of delivering gasoline.[8] Accordingly, we find no merit to the argument that this exception entitles QT and Thompson to

---

[8] Compare *Glenn v. Gibbs*, 323 Ga. App. 18, 24 (1) (746 SE2d 658) (2013) (physical precedent only) (plaintiff's husband assumed risks of dangers ordinarily attendant in trimming tree branches on defendant's property); *Odister v. Leach*, 257 Ga. App. 106, 108 (570 SE2d 391) (2002) (plaintiff injured while cutting a tree limb assumed the risks of any dangers that "would ordinarily and naturally exist in doing the work he was employed to perform") (citation and punctuation omitted); *Howell v. Farmers Peanut Market of Sowega, Inc.*, 212 Ga. App. 610, 611 (2) (442 SE2d 904) (1994) (plaintiff hired to replace grain elevator motor and injured while motor was hoisted into place assumed the risks of the work performed); *Elsberry*, 209 Ga. App. at 622 (plaintiff hired to replace roof and who slipped from the roof assumed the ordinary risks attendant to that employment).

judgment as a matter of law. Rather, we interpret this argument as just another way of asserting that Travis's claims should be barred because he assumed the risk of any alleged danger arising from the conditions QT imposed by continuing to work under such conditions. We have found that factual questions remain on this issue barring summary judgment.

Accordingly, we reverse the trial court's grant of summary judgment to QT and Thompson.

*Judgment reversed. Miller, P. J., and McFadden, J., concur.*

14