## A10A1565. CARTER v. COUNTRY CLUB OF ROSWELL, INC.
### (705 SE2d 170)

ADAMS, Judge.

The trial court granted summary judgment on Earl Carter's premises liability claim against Country Club of Roswell, Inc. ("CCR") seeking damages for injuries he sustained when moveable wall panels in CCR's ballroom fell on him. Carter appeals the summary judgment order, and for the reasons set forth below, we reverse.

In this appeal, we "conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006). So viewed, the record shows that in 2006, while Carter was working as a day laborer for a temporary staffing agency, he was assigned to work for a company called Acousti. On March 13, 2006, Acousti dispatched Carter and Emerson Westwood, Acousti's chief technician, to respond to a service call for repair of a moveable wall partition in CCR's ballroom. This wall is comprised of seven sections of large panels[1] that fold together and can be inserted into storage pockets on each side of the ballroom. One storage pocket holds three sections while the other holds four. When extended, the panels meet in the middle and divide the ballroom in half to accommodate various functions. Wheels, or trolleys, mounted to the top of the panels, roll along a track as the wall is opened and closed, and the panels are attached to these trolleys with pendant bolts. The bottoms of the panels are equipped with retractable drop seals to seal out noise.

Acousti had originally installed the moveable wall for CCR approximately ten years earlier when the facility added a ballroom addition. When Acousti installs these walls, the company routinely provides its customers with brochures and "close-out" documents showing how to maintain them. It was also Acousti's custom to do a demonstration showing the client how to properly operate the panels and to inform them that the walls needed to be serviced approximately once per year, depending upon the frequency of use. Acousti also offered service contracts, under which the company would

---

[1] Each panel weighs approximately 350 pounds.

service the walls once or twice per year. During this service, Acousti employees would inspect each panel individually, check parts, ensure the trolleys rolled properly and grease the track. CCR did not enter into one of these service contracts, but CCR's facility manager, William Morgan, often helped set up the wall and take it down, and at those times, he would do a "physical inspection" and request service as needed. CCR had not requested any service visits from Acousti for approximately three years prior to the incident in this case.

In March 2006, Morgan began to notice mechanical trouble retracting and/or extending the drop seals. While doing a visual inspection of the wall, Morgan noticed a bolt that he had never seen before protruding from the top of a panel, about one-half inch between the track and the wall, although he did not know the significance of the protruding bolt. He said he placed a call to Acousti to address these problems.

But according to Danny Montrois, Acousti's field superintendent, Morgan reported only that the panels were stuck inside the pockets when he called to request service. He never mentioned a loose bolt. Westwood also recalled that when Carter and he arrived at CCR, Morgan told him that a "16-year-old kid" who "didn't know what he was doing" improperly put the panels away with the drop seals still extended, and the panels were stuck in the pocket.[2] Westwood said that Morgan did not mention that any bolts were loose until after the incident. And the only thing Carter recalled Morgan saying was that someone had put the doors away improperly with the drop seals down.

Westwood explained that Carter and he would not have been able to independently discover the loose bolts or fully inspect the panels before beginning repairs because of the way they were jammed into the pocket. Had Acousti or Westwood been informed of the loose bolts, the repairs would have been approached differently, and Westwood and Carter would not have attempted to move the panels. The job would have been approached as a "rehang job," not a repair job. Morgan asserts, however, that as he walked Carter and Westwood to the ballroom, he told them about the problems they were having with the drop seal and that he had seen a section of a bolt.

When Westwood and Carter arrived in the ballroom, the panels

---

[2] Proper operation of the wall requires that the drop seals on the panels be retracted before the panels are folded away into the pocket. That way, the panels move very easily, but if the drop seals are not retracted the panels are very difficult to move. And the drop seals will often become jammed under the panels as they are tucked away in the side pockets, making them difficult to remove.

YALE LAW LIBRARY

were still folded away in the side pockets, with the drop seals extended. The panels had to be pulled out in order for the repairs to begin, so Westwood, Morgan and Carter all began pulling the panels from the four-panel pocket. When they had pulled out the panels approximately six inches, a pair of the panels fell over and onto Carter, resulting in extensive injuries. Westwood testified that the panels fell because, over time, the bolts on the panels had worked their way loose from the trolley and were almost ready to come out. This is evidenced by the fact that Morgan saw a bolt sticking up prior to the incident, and after the incident he was able to show Westwood two more sets of panels with loose bolts.

Carter asserts that the trial court erred in granting CCR's motion for summary judgment because material issues of fact exist as to whether CCR was negligent in failing to regularly inspect and maintain the wall and in failing to warn him of the other issues with the wall, including the loose bolt. Additionally, he asserts that he and Westwood could not have discovered these problems by the exercise of ordinary care prior to beginning work because the panels were jammed into the side pockets through misuse. If Acousti had known about the other issues with the wall, it would have approached the repairs in a different manner.

CCR counters that it did not have superior knowledge of any hazard as Morgan and CCR were unaware of the significance of the loose bolt Morgan had seen. They had no knowledge that loose bolts meant the panels could fall. Rather, CCR relied upon Acousti to diagnose any problems with the doors and to repair them. Additionally, CCR asserts that an exception to premises liability exists for persons brought in to work on a property, who suffer an injury arising from the course of that work. See, e.g., *Howell v. Farmers Peanut Market of Sowega*, 212 Ga. App. 610, 611 (2) (442 SE2d 904) (1994).

Generally, in a premises liability action against a property owner, "[a]n owner or occupier of land is liable to invitees for injuries caused by his failure to exercise ordinary care in keeping his premises and approaches safe." *Gunter v. Patterson Bank*, 247 Ga. App. 555, 557 (544 SE2d 735) (2001). And the "duty of ordinary care that a patron owes to his invitees is the same duty of ordinary care in keeping the premises safe which a master owes to his servant." (Citations and punctuation omitted.) *Strickland v. Howard*, 214 Ga. App. 307, 308 (1) (447 SE2d 637) (1994). Thus, the owner has an obligation to keep the premises safe, which

> includes a duty to inspect the premises to discover possible dangerous conditions of which he does not know and to take reasonable precautions to protect the invitee from dangers

which are foreseeable from the arrangement and use of the premises. The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner and not known to the person injured that a recovery is permitted.

*Thomas v. Home Depot, U.S.A.*, 284 Ga. App. 699, 700 (644 SE2d 538) (2007). Moreover, "[a]n owner/occupier is on constructive notice of what a *reasonable* inspection would reveal." (Footnote omitted; emphasis supplied.) *Jackson v. Waffle House*, 245 Ga. App. 371, 373 (1) (537 SE2d 188) (2000).

"However, an exception to the general rule exists where workers are hired to perform work which makes safe a place known to be dangerous or which in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses." (Citation omitted.) *Batts v. Cracker Barrel Old Country Store*, 219 Ga. App. 327, 328 (464 SE2d 829) (1995).

> Thus, where the injured servant was hired for the express purpose of assisting in the repair, demolition, or alteration of some instrumentality . . . and the unsafe conditions from which the injury resulted arose from or were incidental to the work undertaken by him, the above-stated general rule is not applicable.

(Citation and punctuation omitted.) *Elsberry v. Ivey*, 209 Ga. App. 620, 621 (2) (b) (434 SE2d 158) (1993).

CCR relies upon a number of cases in which this Court applied this exception to uphold a judgment for the property owner as a matter of law. In *Elsberry v. Ivey*, for example, Elsberry was hired to remove a roof from a 100-year-old log house "from the top down." Elsberry began by removing a layer of asphalt shingles and after three to four hours had worked his way down to the underlying wooden shingles, which slid, causing him to fall. This Court upheld summary judgment in favor of Ivey, the property owner, ruling that Elsberry assumed the risk of working on the roof of an old house and his injury arose from dangers that "ordinarily and naturally exist in doing the work" for which he was employed. Id. at 622 (2) (c). "But this is not all. The servant could not have engaged in the work without knowing and seeing . . . the identical condition which, as grounds of negligence, it is alleged that the master allowed to exist." (Citation and punctuation omitted.) Id.

This Court applied the same principle in upholding summary

judgment for the property owner in *Howell v. Farmers Peanut Market*. Howell was hired to help replace the engine in a grain elevator. He arrived at the worksite as the new engine was being hoisted into place, and became concerned because the motor was caught in an opening on the roof. He ordered the hoisting to stop because he was concerned that the motor might break free and drop. Howell had the opportunity to inspect any potential dangers and then began to direct the hoisting of the motor when it resumed. This Court affirmed the trial court's grant of summary judgment under the hired worker exception. *Howell*, 212 Ga. App. at 611 (2). See also *Odister v. Leach*, 257 Ga. App. 106, 108 (570 SE2d 391) (2002) (Odister assumed risk of cutting a tree limb with a chain saw while standing on a ladder and injury from falling tree limb where his vantage point on ladder gave him opportunity to assess danger); *Batts v. Cracker Barrel*, 219 Ga. App. at 328 (Batts assumed risk of working in trench built in old pond bed where trench had caved in five to six times previously and he knew walls were not shored up).

In each of these cases, the plaintiff had the opportunity to observe the situation and to assess the risks for himself. Thus, as applied, the hired worker exception is but another expression of the doctrine of assumption of risk. *Long Leaf Indus. v. Mitchell*, 252 Ga. App. 343, 344 (1) (556 SE2d 242) (2001) (exception "presupposes that the involved risk is incidental to the work performed and, therefore, known to, and assumed by, the worker") (footnote omitted). Moreover, the danger in the cited cases arose as a direct result of performing the job for which the plaintiff was hired.

Here, the evidence construed in Carter's favor supports a jury finding that neither Westwood nor he could have observed the potential danger presented by the loose bolts because the doors were jammed tightly into the side pockets. And a jury could find that an unsupervised and untrained CCR employee improperly stowed the panels, preventing Carter and Westwood from observing the dangerous condition of the panels. Thus jury issues exist as to whether the hired worker exception would apply in this case. If not, the general rules of premises liability apply. And jury issues exist as to whether the loosening of the bolts occurred over the three-year period since Acousti had last been called to service the wall and while CCR had assumed sole responsibility for inspections; whether CCR's inspections of the wall were reasonable; and whether CCR knew or should have known of a potentially dangerous condition with the wall. Conversely, jury issues also exist as to whether Carter's experience in working with Acousti also gave him knowledge of the potential danger and whether he failed to exercise ordinary care for his

personal safety under the circumstances.[3]

We find, therefore, that the facts in this case are more akin to those in *Greenforest Baptist Church v. Shropshire*, 221 Ga. App. 465 (471 SE2d 547) (1996), where the church hired Shropshire to tear down a barn on church property. Despite Shropshire's warning to the church not to allow any persons in the vicinity, the evidence showed that while Shropshire was on the barn roof, church workers arrived and began haphazardly discarding two-by-fours in the work area. Shropshire asked for the area to be cleaned, but when he descended from the roof, he stepped on a nail protruding from a two-by-four and was injured. This Court determined that material issues of fact remained as to whether the church workers worked and cleaned in a negligent manner and whether Shropshire could have detected the hazard by the exercise of ordinary caution. Id. at 467-468. As the Court noted in *Shropshire*, "Only in clear and palpable cases, where it appears that one recklessly tests an observed and clearly obvious peril, or voluntarily assumes a position of imminent danger, will he be barred from recovery as a matter of law." (Citation and punctuation omitted.) Id. at 467.

> Moreover, we are reminded by the Supreme Court [of Georgia] that the routine issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and summary judgment is granted only when the evidence is plain, palpable, and undisputed.

(Footnote omitted.) *Gunter*, 247 Ga. App. at 555-556. Because the evidence here is not so plain, palpable and undisputed, we reverse the trial court's grant of summary judgment to CCR.

*Judgment reversed. Smith, P. J., and Mikell, J., concur.*

DECIDED OCTOBER 13, 2010 —
RECONSIDERATION DENIED DECEMBER 10, 2010 — ■■■■■■

*Slappey & Sadd, James N. Sadd, Henry R. DeGive*, for appellant.

---

[3] When determining whether an invitee failed to exercise ordinary care for her personal safety, "the issue is whether, taking into account all the circumstances existing at the time and place of the fall, the invitee exercised the prudence the ordinarily careful person would use in a like situation." (Citation and punctuation omitted.) *Dumas v. Tripps of North Carolina*, 229 Ga. App. 814, 815 (1) (495 SE2d 129) (1997).

*Carlock, Copeland & Stair, Wayne D. McGrew III, Spencer A. Bomar*, for appellee.