**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 19, 2018**

# In the Court of Appeals of Georgia

A18A0928. GARCIA et al. v. KRC ALDERWOOD TRAILS, LLC et al.

REESE, Judge.

Paulino Tereza Moran (the "Decedent") was changing a light bulb on a 30-foot light pole at Alderwood Trails Apartments (the "Property") when the pole snapped at the base, causing him to fall and sustain fatal injuries. The Appellants, the minor children and the administratrix of the Decedent's estate, filed a wrongful death action based on premises liability against KRC Alderwood Trails, LLC, and Strategic Management Partners, LLC ("SMP"), the owner and manager of the Property, respectively (collectively, the Appellees). The State Court of DeKalb County granted summary judgment in favor of the Appellees, and this appeal followed. For the

reasons set forth, infra, we reverse the judgment and remand the case for further proceedings.

Viewed in the light most favorable to the Appellants, as the non-moving parties,[1] the record shows the following. In November 2013, KRC acquired the Property and contracted with SMP to manage it. The Property, which had been built in 1972, included multiple apartment buildings and recreational areas, including a "sports court[,]" lit by four metal light poles. The subject pole was approximately 30 feet tall. At the top of each pole was a crossbar with a light fixture on each end. The poles were bolted to steel plates that were affixed to concrete pads, but the subject pole was in contact with soil on one side. Erosion in the area indicated that the soil level may have previously been higher.

Prior to purchasing the Property, KRC had obtained a property condition assessment report, "in order to evaluate acceptance of the Property as collateral to support a real estate-secured loan." "In accordance with the agreed scope of work, [the] assessment [was] based upon observation of portions of the Property believed to be representative of overall conditions. Accordingly, conditions [could] exist which were not identified as a result of [the] assessment and overall conditions [could] vary from those identified [t]herein." The report indicated significant areas

---

[1] See *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

2

of soil erosion throughout the property, however, and recommended that KRC hire an engineer to devise a plan to improve drainage.

SMP employed a maintenance staff with "the basic tools" to make routine repairs, but regularly hired independent contractors for "major repairs." In November 2014, SMP contacted Tereza Repair, LLC, a business owned by the Decedent's brother, Ramiro Tereza-Moran ("Tereza"), because some of the lights at the sports court were not working.

The Decedent worked at a car wash, but had prior experience in maintenance and had been helping out Tereza in the year and a half to two years that the business had been operating. The two men visited the Property one evening to see what needed to be done to fix the lighting. They went to every light pole, noting that the poles appeared to be stable, and used a ladder to view the two shorter poles. According to Tereza, they looked at the base of the pole at issue and observed that "[t]here was a little bit of trash there but [the two taller poles] looked good." He said they saw nothing obviously wrong with the pole, but emphasized that they were only there to change the lightbulbs.

Tereza prepared a proposal to replace four of the lightbulbs and included in the bid the cost of renting a "scissor lift" or forklift "because the pole was so high." A

3

nearby Home Depot and two other businesses did not have one immediately available, however, so Tereza decided to connect a portion of one ladder to a second extension ladder when they replaced the lightbulbs the following day.

In January 2015, SMP again contacted Tereza to replace lightbulbs at the sports court. Tereza and the Decedent visited the Property to see what needed to be done. Tereza submitted an initial bid, but reduced the price after SMP balked at paying for a forklift. According to Tereza:

> We wanted to use a forklift not because the ladder was not safe, but because the pole was so high. But the pole had screws and had a [crossbar] that you could put the ladder on, and we had used the ladder before. If we wanted the job, we would have to use the ladder because [SMP] knew that we had used a ladder before and . . . we did not need the forklift.

On February 17, 2015, the Decedent went to the Property with another relative who had recently begun working for Tereza. The two men connected two ladders in the same configuration as in the past, and the Decedent climbed up to replace a bulb, using a safety harness to secure himself to the subject pole. After the Decedent had been working on the bulb for approximately one minute, he asked "Did the post

4

move?" At that moment, the pole snapped at its base and fell to the ground, fatally injuring the Decedent.

The Appellants retained an expert in metallurgy and materials failure analysis, "to investigate the [pole's] failure and determine [its] cause." The metallurgist testified that the pole had "serious blistering of the paint" near the point of failure such that someone doing an inspection of the pole would have questioned its structural integrity. Based on the extent of the corrosion, the metallurgist opined that the condition would have developed years before KRC acquired the Property. In his opinion, "based on the corrosion, pitting, and serious blistering of paint . . . the subject light pole had not been properly maintained for a long time prior to its failure."

Questioned whether the condition of the pole would be "readily apparent to any ordinary, reasonably prudent person[,]" the metallurgist responded that it was "a little hard as an engineer and metallurgist to . . . put [him]self in the mind of an untrained person." He elaborated:

> If you looked at [the pole] closely, you would be able to see the blistering of the paint. Whether that would set off any red flags in your mind would depend on your training and experience. If you had shined a light inside the pole, I think the conditions in there would raise a red

flag to maybe a few more people, but still some people, not . . . trained in maintenance and . . . preservation of equipment, might not immediately apprehend that this was a dangerous condition.

The metallurgist further testified that "[a] competent, properly trained property maintenance supervisor should recognize that a 30-foot steel light pole [was] an engineered structure that require[d] regular inspection and that it [could] require maintenance or repair at some point in its lifetime." According to the metallurgist,

> [r]outine inspection and maintenance would have revealed at an early stage of the corrosion the hazard presented by the deterioration near the base of the subject light pole, and proper maintenance, if begun at an early stage of the corrosion process, would have prevented further deterioration or led to its repair. If corrosion was discovered after serious thinning of the steel had taken place, a proper structural repair should have been done or removal and replacement of the pole should have been done.

The Appellants also retained a civil engineer, who testified that SMP "ha[d] a duty to do frequent and regular safety inspections of the workplace." The engineer opined that the Appellees failed to follow industry standards by "fail[ing] to conduct *any* inspections, maintenance or repair to the subject steel light pole, which allowed

it to deteriorate over time until it ultimately failed[.]"[2] The engineer noted that there was no evidence the pole had been inspected[3] and that the Appellees should have hired an outside consultant or structural engineer to inspect the pole.

The civil engineer further opined that, although a visual inspection of the soil around the base of the pole and paint blistering should have put SMP on notice of the hazard based on its maintenance supervisor's training from the Occupational Safety and Health Administration and SMP's knowledge that the pole had not been inspected since purchase of the Property, a subcontractor would have had no such knowledge. According to the engineer, a general repair subcontractor who had been hired for a reason other than to verify that the pole was structurally sound "ha[d] every reason to expect that pole, as you would a building, to be structurally sound[.]"

After a hearing, the state court granted the Appellees' motion for summary judgment, finding that there was no evidence that KRC had knowledge of the defect that was superior to that of the Decedent, who had "pushed on [the pole] to test its strength[ ]" prior to ascending it and who had previously climbed the subject pole.

---

[2] (Emphasis in original.)

[3] The record contains the deposition of SMP's maintenance supervisor, who testified that he had no knowledge of anyone ever working on the light posts or checking them "for stability or rust or signs of decay[.]"

In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[4]

"The 'routine' issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and . . . summary judgment is granted only when the evidence is *plain, palpable, and undisputed*."[5]

With these guiding principles in mind, we now turn to the Appellants' specific claims of error.

---

[4] *Benton*, 280 Ga. at 470.

[5] *Johnson Street Properties v. Clure*, 302 Ga. 51, 57 (1) (a) (i) (805 SE2d 60) (2017) (emphasis supplied).

8

The Appellants contend that the state court erred in finding that the Appellees had met the duties imposed on a landowner pursuant to OCGA § 51-3-1,[6] Specifically, the Appellants argue that the Appellees, who had a non-delegable duty to maintain the subject light pole,[7] failed to make the premises safe for invitees. In related arguments, the Appellants contend that the trial court erred by holding as a matter of law that the Appellees did not have superior knowledge of the defect and that the Decedent had a duty to inspect the pole and thus had superior knowledge under the hired worker liability exception. We agree with the Appellants that the record precluded summary judgment.

> Georgia premises liability law holds owner/occupiers of land liable for damages suffered by an invitee on their property where the invitee's injuries were caused by the owner/occupier's failure to exercise ordinary care in keeping the premises and approaches safe. While not an insurer of the invitee's safety, the owner/occupier is required to exercise

---

[6] OCGA § 51-3-1 provides that "[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."

[7] See *Carpenter v. Sun Valley Properties*, 285 Ga. App. 1, 2 (645 SE2d 35) (2007) ("[A] nondelegable duty exists under OCGA § 51-3-1, which requires a property owner to exercise ordinary care in keeping its premises and approaches safe for invitees.").

ordinary care to protect the invitee from unreasonable risks of harm of which the owner/occupier has superior knowledge. The owner/occupier owes persons invited to enter the premises a duty of ordinary care to have the premises in a reasonably safe condition and not to expose the invitees to unreasonable risk or to lead them into a dangerous trap. The owner/occupier is not required to warrant the safety of all persons from all things, but to exercise the diligence toward making the premises safe that a good business person is accustomed to use in such matters. This includes inspecting the premises to discover possible dangerous conditions of which the owner/occupier does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises. In other words, an owner/occupier is generally on constructive notice of what a reasonable inspection conducted in the exercise of ordinary care would reveal. However, one is not chargeable with negligence in failing to discover and remedy a danger in the property which he could not have discovered by the exercise of ordinary care, or which has not existed for a sufficient time to charge him with the duty of discovering it.[8]

Thus, a property owner's "constructive knowledge may be inferred when there is evidence that the owner lacked a reasonable inspection procedure."[9] Further, it is

---

[8] *Johnson Street Properties*, 302 Ga. at 53-54 (1) (a) (i) (citations and punctuation omitted).

[9] *St. Joseph's Hosp. of Atlanta v. Hall*, 344 Ga. App. 1, 4 (1) (a) (806 SE2d 669) (2017).

10

for the jury to assess whether the circumstances of the case required more frequent inspections than those conducted by the property owner.[10]

The property owner's duty to keep his property safe applies to individuals who are hired to work on the premises.[11] When the property is an inherently and obvious unsafe area, such as a construction or demolition site, and the worker is hired to assist in the repair, construction, or demolition of the site, then the hired worker/independent contractor liability exception applies, so that the owner or occupier of the property is not liable to a worker in such a work site whose injuries "arose from or were incidental to the work undertaken by him[.]"[12] This is because the worker has actual notice of the dangers associated with the work and has the opportunity to "observe the situation and to assess the risks for himself."[13] In other words, "the hired worker exception is but another expression of the doctrine of

---

[10] *McGarity v. Hart Electric Membership Corp.*, 307 Ga. App. 739, 746 (2) (706 SE2d 676) (2011).

[11] See *Howell v. Farmers Peanut Market of Sowega*, 212 Ga. App. 610, 611 (1) (442 SE2d 904) (1994).

[12] See id. (citation and punctuation omitted).

[13] *Carter v. Country Club of Roswell*, 307 Ga. App. 342, 346 (705 SE2d 170) (2010).

assumption of [the] risk."[14] Further, "[o]nly in clear and palpable cases, where it appears that [a hired worker or independent contractor] recklessly tests an observed and clearly obvious peril, or voluntarily assumes a position of imminent danger, will he be barred from recovery as a matter of law."[15]

In this case, had the Decedent been hired to fix the pole and was in the process of fixing it when the pole fell, then the hired worker/independent contractor exception could apply, given that he would have had actual knowledge (or at least constructive knowledge) that the pole might be unsafe or unstable and could fall. In this case, however, the Decedent was not hired to inspect or fix the pole itself. Even though climbing a ladder to reach the top of a 30-foot light pole might be considered inherently unsafe, nothing in the record indicates that either the height of the pole or a defect in the ladder was the proximate cause of the Decedent's fall. Instead, construing the summary judgment evidence in favor of the Appellants, it was corrosion at the base of the pole that caused the pole to break and resulted in the Decedent's fall.

---

[14] Id.

[15] Id. at 347 (citation and punctuation omitted).

12

Because jury issues exist as to whether Appellees had superior (constructive) knowledge of the potential danger, the evidence in this case is not plain, palpable, or undisputed. The record includes expert testimony that the Appellees had a duty to inspect the pole and that a reasonable inspection would have revealed the hazard.[16] A genuine issue of material fact exists as to the Decedent's exercise of ordinary care for his own safety and whether the hired worker liability exception applied.[17]

*Judgment reversed and case remanded. Barnes, P. J., and McMillian, J., concur.*

---

[16] See *Johnson v. Kimberly Clark*, 233 Ga. App. 508, 511-512 (504 SE2d 536) (1998).

[17] See *Carter*, 307 Ga. App. at 346-347 (jury issue existed as to whether the hired worker liability exception applied and specifically whether a temporary worker assigned by a contractor to repair a door panel the contractor had installed ten years earlier could have observed the potential danger from loose bolts and whether the property owner had improperly stowed the panels, preventing the worker from observing the dangerous condition); cf. *Forest Cove Apartments v. Wilson*, 333 Ga. App. 731, 734-735 (776 SE2d 664) (2015) (reversing the denial of summary judgment where the evidence showed "plainly, palpably, and without dispute" that an independent contractor, who had been hired to inspect and repair an upstairs bathroom, had at least equal knowledge of the hazardous condition of undersized and water-damaged floor joists where she and her crew had removed the damaged subfloor as part of their bathroom repair job, thereby exposing the damaged floor joists).