**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 10, 2022**

# In the Court of Appeals of Georgia

A21A1424. SINYARD et al. v. GEORGIA POWER COMPANY.

A21A1425. SINYARD et al. v. FORD MOTOR COMPANY.

A21A1426. SINYARD et al. v. PIEDMONT HOSPITAL, INC.

Pinson, Judge.

Kevin Sinyard worked as a pipefitter for more than 25 years. From 1975 to 1989, he was employed by the local pipefitters union and worked for various contractors as a pipefitter on projects at Georgia Power Company, Ford Motor Company, and Piedmont Hospital. In 2014, Sinyard was diagnosed with malignant pleural mesothelioma. He and his wife sued Georgia Power, Ford, and Piedmont, claiming that his disease was caused by his exposure to asbestos while working at facilities owned by these three companies. The trial court granted complete summary judgment in favor of each defendant, and the Sinyards now appeal.

In A21A1424, Sinyard appeals from the trial court's order granting summary judgment in favor of Georgia Power. We affirm the trial court's order in part: we agree that Georgia Power is immune from tort liability related to Sinyard's work on the new Units at Plants Scherer and Vogtle because Georgia Power was acting as a contractor and thus was a "statutory employer" entitled to such immunity under the Workers' Compensation Act. But we agree with Sinyard that genuine issues of material fact preclude summary judgment as to the remaining issues: (1) whether Sinyard had equal knowledge of the specific risks of exposure to asbestos at the time he worked at the Georgia Power plants; (2) whether the narrow "hired worker" exception relieves Georgia Power of its ordinary duty towards Sinyard as an invitee; and (3) whether Georgia Power had relinquished control and possession of the premises to Sinyard's employers, which would have also relieved it of that duty.

In A21A1425, Sinyard appeals from the trial court's order granting summary judgment to Ford. Here, too, we conclude that genuine issues of material fact preclude summary judgment, including (1) whether Sinyard had equal knowledge of the specific hazards posed by asbestos at the Ford plant, and (2) whether Ford relinquished possession and control over the relevant portion of the plant.

In A21A1426, Sinyard appeals from the trial court's grant of summary judgment to Piedmont. Here, we affirm the trial court's order because the evidence viewed in the proper light shows that McKenney's—Sinyard's employing contractor for his work at Piedmont—had equal knowledge of the specific hazards of asbestos and its presence at Piedmont.

Background

Viewed in the light most favorable to Sinyard, the nonmovant,[1] the record shows that Sinyard was a pipefitter for more than 25 years and worked for more than 41 contractors at various job sites across Georgia.[2] From 1975 to 1989, Sinyard

---

[1] *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 696, n. 1 (730 SE2d 164) (2012).

[2] At the outset, we note that the record before us consists of more than 24,000 pages contained in 75 volumes. It is not the function of this Court to "cull the record on behalf of a party, particularly in a case such as this where the record is voluminous." *Callaway v. Willard*, 351 Ga. App. 1, 5 (1) (830 SE2d 464) (2019) (citation omitted); see *Harris v. State*, 256 Ga. App. 120, 122 (2) (567 SE2d 394) (2002) ("We have repeatedly held that it is not the function of this [C]ourt to cull the record on behalf of a party. This is particularly true in a case such as this where the transcript alone exceeds 1,500 pages.") (footnote and punctuation omitted). So, while it appears the parties' briefs and our independent review of the record have identified the portions of the record relevant to this appeal, we caution that "if we have missed something in the record or misconstrued an argument, the responsibility rests with [the parties'] counsel." *Cawthon v. State*, 350 Ga. App. 741, 743 (830 SE2d 270) (2019) (citation and punctuation omitted).

worked for contractors on projects at Piedmont, Georgia Power, and Ford. We will first review Sinyard's knowledge of the risks of asbestos at the relevant times, and then we will describe Sinyard's work for each of the three defendants.

*(a) Sinyard's Knowledge of the Risks of Asbestos*

Sinyard was a member of Local Plumbers, Pipefitters & HVAC Technicians Union 72 in Atlanta from 1978 until 1996. After Sinyard completed high school, he did an apprenticeship program with the local union. The national union distributed a monthly newsletter called the "UA Journal" that was delivered to its members' homes. Beginning in 1971, these newsletters occasionally contained articles regarding the dangers of asbestos exposure. Sinyard testified that he "never read" the newsletters because they looked like "junk mail."

Sinyard testified that he did not learn of the specific risks of developing cancer or other diseases as a result of exposure to asbestos until the late 1980s. Sinyard explained that, as part of his apprentice training in 1978, he was taught that if he identified asbestos, he was supposed to wear an "Armstrong-style" paper mask and "wet it down" to minimize the creation of dust while he worked. Sinyard testified that he never wore a respirator mask or protective suits while working with asbestos. He had never been given formal training by the union or his supervisors about how to

4

identify asbestos, but rather had learned in the late 1980s "through the ranks and through the knowledge of the people that were on the job." He also did not recall any discussion of asbestos at local or national union meetings that he attended.

Sinyard's union foreman, Eugene West, testified that the union pipefitters lacked knowledge of the dangers posed by asbestos in the 1980s. He explained that, because he was a supervisor, the pipefitters union would have informed him before rank-and-file members about dangerous working conditions, but he did not learn about the specific health risks posed by asbestos until the late 1980s. West testified that although he knew asbestos was "bad for you" as early as the late 1970s, he "didn't realize it was so dangerous" or that it could cause mesothelioma until the late 1980s.

*(b) Georgia Power*

*(i) Sinyard's Work at Georgia Power Plants*

Sinyard performed work as an independent contractor for four Georgia Power plants—Scherer, Branch, McDonough and Vogtle—between 1979 and 1986. Sinyard was never directly employed by Georgia Power, and his work was not continuous during this time; instead, he would work for four to six weeks when needed, which was approximately once a year.

5

Georgia Power was the majority owner of Plants Scherer and Vogtle. The minority co-owners were Municipal Electric Authority of Georgia, the City of Dalton, and Oglethorpe Power Company. Under the terms of its agreements with the co-owners, Georgia Power assumed "sole . . . responsibility" for the construction and planning of the new Units at Plant Scherer and Plant Vogtle. Sinyard worked at Plant Scherer as an independent contractor with two companies, Power Piping and Combustion Engineers, on and off between 1980 and 1983. He worked all over the facility, but primarily in the boiler areas, main steam lines, and the turbine areas during the construction of Units 1, 2, and 3 while each Unit was being built. Sinyard worked at Plant Vogtle as a pipefitter during the new construction of Units 1 and 2 in 1985.

Sinyard worked at Plant McDonough on two occasions in 1983 for Combustion Engineering and Cleveland Consolidated. Sinyard testified that, while doing maintenance work at Plant McDonough during plant shutdowns, he worked next to the boiler and had "to tear the insulation and stuff all around the boiler" and related piping systems. He recalled installing valves manufactured by Crane and Honeywell, pumps manufactured by Ingersoll Rand and Garlock, and gaskets manufactured by Garlock. To install these new items, he had to break "apart the old system, scraping

6

all the old gaskets off and brushing them off and then putting in [the] new valve. . . torque it up to spec [and] tighten up all [the] packings." This work created dust that he would breathe in. Sinyard testified that there were no warnings or labels regarding the dangers of asbestos on these products or around the facilities.

Sinyard worked at Plant Branch in 1982 and 1983 as an independent contractor with Cleveland Consolidated and in 1986 as an independent contractor with Atlanta Steel. He performed maintenance during plant shutdowns, which included replacing old Ingersoll Rand pumps with new pumps. West testified that he supervised Sinyard while working at Plant Branch, and that they worked with Crane, Honeywell, and Ingersoll Rand valves while working there.

*(ii) Asbestos at Georgia Power Plants*

A representative for Georgia Power testified that Georgia Power has used asbestos gaskets, asbestos packing, and asbestos insulation in its plants since the 1930s and continued to stock asbestos products as late as 1992. The representative agreed that asbestos-containing materials existed in all of Georgia Power's plants during the period of Sinyard's employment. Georgia Power records confirm that Crane and other asbestos gasket and packing material identified by Sinyard was

installed in Georgia Power facilities. West testified that Georgia Power's plants contained "miles" of pipe that was insulated with asbestos.

*(iii) Georgia Power's Knowledge of the Risks of Working with Asbestos*

Georgia Power's representative testified that Georgia Power knew that asbestos-containing materials were present in its plants. She also testified that the company knew—before Sinyard began work at the facilities—that a person who is exposed to asbestos could contract mesothelioma. Georgia Power admitted that it was aware of OSHA's earliest regulations relating to asbestos as early as 1972, that the National Institute for Occupational Safety and Health published standards in 1976 that informed Georgia Power that cases of mesothelioma had been associated with exposures to asbestos "as brief as one day," and that it was aware that scientific literature from as early as 1973 showed that exposure to asbestos caused cancers such as mesothelioma.

In response, Georgia Power enacted policies and procedures to protect its own employees from asbestos exposure. In 1977, Georgia Power drafted an interim policy concerning "Use of Asbestos and Asbestos Products" addressed to production managers, operating managers, construction managers, and construction superintendents that acknowledged asbestos as part of Georgia Power's "hazardous

8

materials control program." Georgia Power's representative further admitted that in 1981, it received Material Safety Data Sheets relating to the Crane asbestos packing used in its plants advising of safety precautions necessary when disposing of old material to protect human health. In 1982, Georgia Power educated and trained its own union employees about the dangers of asbestos, how to wear protective gear, and how to properly handle and dispose of asbestos in Georgia Power facilities.

Further, in 1983, Georgia Power regulated the use of asbestos gaskets under its Chemical Control Program and required its own employees to "pass Health Hazard Data . . . and special precaution information along to GPC employees coming in contact and/or working with [the] material." The representative also testified that in the 1980s, Georgia Power required any employees working with asbestos to "follow procedures that included wetting the surface, using glove bag technique, and isolating the asbestos fibers that were being released into the air from the breathing zone of the worker." Although Georgia Power provided respirators to its own employees certified for use to protect against asbestos dust, it never provided respirators to pipefitters working for outside contractors, such as Sinyard.

Georgia Power did not communicate this knowledge about the dangers of asbestos exposure to Sinyard's employing contractors. Further, Georgia Power never

9

provided pipefitters with asbestos hazard warnings and never posted such warnings at the plant despite internal policies requiring it to do so. Instead, Georgia Power relied upon the contractors "to make a determination as an employer if you're exposing your employees to asbestos or not." Georgia Power's representative testified that when the company hired "contractors . . . it is included in their contract that they adhere to the rules of OSHA, federal, state, local law."

*(c) Ford Motor Company*

*(i) Sinyard's Work at Ford Motor Company*

Between 1981 and 1995, Sinyard worked for various independent contractors hired to do intermittent work at Ford's vehicle assembly plant in Hapeville. Sinyard worked at the Hapeville plant during various jobs from 1981 to 1985 for Cleveland Consolidated and on a job for Mann Mechanical in 1986 during a plant shutdown. Each time Sinyard was assigned to work at the Ford plant, his wages and benefits came from Local Union 72.

*(1) Cleveland Consolidated (1981-1985)*

When working for Cleveland Consolidated, Sinyard recalled that he performed "fill-in" maintenance work at the Hapeville plant on several occasions between 1981and 1985. Sinyard worked on the plant's piping systems doing less desirable

10

weekend, overnight and holiday shifts when Ford employees did not want to work. Ford's representative testified that he was "surprised" that non-UAW union members would perform fill-in maintenance at the Hapeville plant, but concedes that such a practice might have been permitted if there was not a UAW union member willing to work during those shifts.

Sinyard deposed that he worked "all over" the Hapeville plant. His job involved replacing and adjusting gaskets and packing material. He explained that when he performed this fill-in work, he would work with a "Ford crew or one of [Ford's] supervisors or one of their pipefitters on shift," and that there were other tradespeople working in the same area who were also overseen by Ford's maintenance supervisors.

*(2) Mann Mechanical (1986)*

Sinyard testified that he worked at the Hapeville plant during a shutdown while employed by Mann Mechanical in 1986. His work at the plant involved "weld water," compressed air, and heating systems, and he worked in the ceiling, underbody and paint areas of the plant. Sinyard testified that, during this period, Ford employees would give directions regarding the job site to his supervisor with Mann Mechanical,

11

who would then give direction to him. He recalled that Ford provided the equipment that he installed during this project.

*(ii) Asbestos at the Hapeville Plant*

Ford's representative testified that there was asbestos present throughout the Hapeville plant from the time it opened in 1947 until it was demolished. Ford used asbestos gaskets and asbestos packing in the plant during the years that Sinyard was employed there.

*(iii) Ford's Knowledge of the Hazards Posed by Asbestos*

Ford's representative admitted that the company was aware as early as 1972 that asbestos was a toxic substance that should not be disturbed in the workplace. Ford implemented internal policies to protect its employees from being exposed to asbestos in the plant. In the 1980s, Ford had an internal policy that employees should not disturb asbestos if other workers were present, and that an employee was to inform a supervisor if he saw "white powder" so that it could be abated by an outside contractor. A bulletin created by Ford's Employee Health Services Department in 1983 informed employees that "[m]ost boiler, furnace, steam, and condensate piping insulation installed prior to 1975 contains asbestos," and that disturbance of asbestos fibers posed a danger to all workers in the area of the disturbance. However, there is

12

no evidence that Ford ever warned outside contractors of the location of asbestos in the plant or the dangers of working around asbestos. Further, Ford never posted any asbestos labels on any of the asbestos-containing materials at the Hapeville plant or posted asbestos warnings on any equipment at the plant that had asbestos in its component parts or insulation encasing it. Although the representative testified that Ford "vetted" outside contractors before hiring them to work around asbestos, he could not provide details about the vetting process.

*(d) Piedmont Hospital*

*(i) Sinyard's Work at Piedmont Hospital*

Sinyard worked full-time as an outside contractor with McKenney's doing pipefitting at Piedmont from 1986 until 1989. Sinyard testified that while working at Piedmont, he did two different kinds of work: (1) helping with the construction of a new OR/ICU addition to the hospital under the supervision of a general contractor and (2) doing "maintenance" work on existing piping systems under the direct supervision of Piedmont's director of maintenance.

Sinyard explained that his primary exposure to asbestos at Piedmont came from his removal of existing asbestos insulation and asbestos cement that covered the pipes he was instructed to repair, or tie-in to, that were connected to the hospital's boiler

13

system. When he installed new valves or did maintenance work on existing valves—which he did on a "daily or weekly" basis—he would tear "out any tie-ins for the old systems" and "tear into the old insulation there in the hospital and make all the tie-ins on that" to the new boiler system. He removed existing asbestos insulation from the pipes and valves by cutting it away with a hacksaw. Sinyard explained that he would "wet it down" in an effort to avoid creating "dust, but . . . you could only stop so much. So we'd wet it down, cut it . . . then sweep it up" when they were done. Sinyard believes he was also exposed to asbestos at Piedmont when he cut penetration holes through existing asbestos transite wallboards using a handsaw to create openings for new pipe.

*(ii) McKenney's Knowledge of Asbestos*

The corporate representative for McKenney's agreed that in the 1980s, the company was aware "that there were asbestos pipe insulation, asbestos gaskets, or asbestos containing products and materials [that] can be found at a hospital like Piedmont." McKenney's further agreed that it was aware that asbestos was "used commonly up until the '90s" in drywall compound, ceiling tile, floor tile, insulation [and] heat blankets" and thus, it knew in the 1980s that its workers, including Sinyard, were likely to encounter asbestos. McKenney's confirmed that it did not

14

retain any written policies or procedures relating to asbestos it may have had at that time. However, its representative testified that the company's "awareness of asbestos . . . evolved over many, many years, probably starting as early as the '70s. . . And how to deal with it, how to recognize it, how to be safe with it was an evolution." The representative testified that in 1985, McKenney's knew that if a worker encountered asbestos at a workplace, it "need[ed] to be dealt with" by wearing a mask and wetting the asbestos to eliminate dust, by informing the premises owner to abate the asbestos, or by hiring a subcontractor to abate it.

*(iii) Piedmont's Knowledge of the Dangers of Asbestos*

By 1976, Piedmont was aware that OSHA regulations and a NIOSH publication pertaining to asbestos stated that exposures to asbestos as brief as one day were recognized as a cause of mesothelioma. In 1985, an environmental specialist with the Air Pollution Compliance Program at the Georgia Department of Natural Resources sent a letter to Piedmont instructing the hospital that although encapsulation of asbestos is an "acceptable . . . abatement method," such a method would not prevent future release of asbestos fibers if the material became "physically disturbed" and thus, Piedmont should place caution signs on items containing

15

asbestos, initiate an inspection and maintenance program to monitor asbestos, and maintain proper building records of its location.

Despite this instruction, Piedmont did not establish a system for maintaining building records to identify asbestos or place asbestos warning signs on anything in the hospital. Further, Piedmont never provided information about the presence or location of asbestos in its facilities to its own employees or outside contractors working on its premises. Instead, Piedmont relied upon the "training" that outside contractors "provide[d] for their workers" to identify and safely handle asbestos.

*(e) Procedural history*

In 2014, Sinyard was diagnosed with malignant pleural mesothelioma. In 2016, Sinyard and his wife filed a lawsuit against Georgia Power, Ford , and Piedmont alleging premises liability, loss of consortium and punitive damages, claiming that his disease was caused by exposure to asbestos while working at facilities owned by these three companies. After a hearing, the trial court granted summary judgment in favor of each defendant, and the Sinyards appeal from those orders.

Discussion

We review orders granting summary judgment de novo. *Davis v. John Crane*, 353 Ga. App. 243, 243 (836 SE2d 577) (2019). Summary judgment is proper when, viewing the evidence and any inferences drawn from it in the light most favorable to the non-moving party, there remains no genuine issue of material fact and so the moving party is entitled to judgment as a matter of law. Id. Here, we apply that standard to the trial court's orders granting summary judgment to Georgia Power, Ford, and Piedmont, in that order.

*Case Number A21A1424. Sinyard et al. v. Georgia Power Company.*

In Case No. A21A1424, Sinyard appeals from the trial court's grant of summary judgment to Georgia Power. Sinyard's claims against Georgia Power are based on the company's alleged negligence in failing to properly maintain its premises and in failing to provide sufficient warnings of the presence of asbestos and the dangers posed by exposure to asbestos from 1979 to 1986, the period he worked on its premises. He contends that the trial court erred in concluding that (1) Georgia Power was immune from tort liability under the Workers' Compensation Act for his work on new Units at Plant Scherer and Plant Vogtle; (2) the company did not owe a duty to Sinyard to keep its premises safe; (3) Sinyard failed to establish that he was

exposed to asbestos at Georgia Power plants; and (4) the statute of repose barred Sinyard's claims. We agree with the trial court that Georgia Power is immune from tort liability for the work on the new Units, but we conclude that genuine issues of material fact preclude summary judgment on the remaining issues.

*1. "Statutory Employer" Immunity for Work at Plants Scherer and Vogtle*

When employees are injured in the course of their employment, their remedy against their employer is generally a workers' compensation claim; with some exceptions, the Workers' Compensation Act immunizes the employer against tort claims. OCGA § 34-9-11 (a) ("The rights and the remedies granted to an employee by this chapter shall exclude and be in place of all other rights and remedies of such employee, . . . and all other civil liabilities whatsoever at common law or otherwise, on account of such injury . . . .").

The Act's liability for workers' compensation and corresponding immunity from tort liability obviously apply to the immediate employer. But they also apply to what are known as "statutory employers": the "principal, intermediate, or subcontractors" who have contracted with the employee's immediate employer for the subject matter in which the employee was engaged. OCGA § 34-9-8 (a); see *Manning v. Georgia Power Co.*, 252 Ga. 404, 405 (314 SE2d 432) (1984) (explaining

18

the "statutory employer doctrine"); *Holton v. Ga. Power*, 228 Ga. App. 135, 136 (491 SE2d 207) (1997) ("The secondary liability and corresponding immunity [for statutory employers] apply to those who contract to perform certain work then sublet that work in whole or in part.").

Whether someone is a statutory employer typically turns on whether they are a "contractor."*Yoho v. Ringier of Am., Inc.*, 263 Ga. 338, 341 (434 SE2d 57) (1993) (Under *"Manning*, only a 'contractor' can be a statutory employer."). So, a company is not a statutory employer if it merely owns (or is in possession and control of) the premises where an employee is injured. *Manning*, 252 Ga. at 405. But if that owner has also "undertake[n] to perform work for another" on the premises, *Yoho*, 263 Ga. at 341, it can "attain 'contractor' status" and so qualify as a statutory employer. *Holton*, 228 Ga. App. at 136. Put another way, "[a]n owner who owes a secondary duty to another to perform a contractual duty is a 'contractor' within the meaning of OCGA § 34-9-8 (a)." Id. (citation omitted).

Here, the trial court correctly concluded that Georgia Power was a statutory employer with respect to Sinyard's work completed during construction of the new Units at Plant Scherer and Plant Vogtle. The record shows that Georgia Power is the majority owner of both plants, with the balance owned by Municipal Electric

19

Authority of Georgia, the City of Dalton, and Oglethorpe Power Company. But under the terms of the purchase and ownership-participation agreements with these co-owners, Georgia Power assumed "sole . . . responsibility" for the "planning, licensing, design, construction, operation . . ." of the new Units to be built at Plant Scherer and Plant Vogtle. Thus, Georgia Power was by agreement obligated to the other owners to build the plants' new Units.[3] By hiring Sinyard's employing contractors for the construction of new Units at Plants Scherer and Vogtle, Georgia Power was fulfilling its obligations as principal contractor. See *Yoho*, 263 Ga. at 341. We have already concluded that such a role qualifies Georgia Power as a statutory employer under OCGA § 34-9-8. See *Holton*, 228 Ga. App. at 136 (holding that Georgia Power, as majority owner of power plant and as principal contractor contractually obligated to other co-owners for plant's maintenance, was plaintiff's statutory employer and was entitled to workers' compensation immunity from his tort claims); *Yoho*, 263 Ga. at 341. Compare *Manning v. Ga. Power Co.*, 252 Ga. 404, 404 (314 SE2d 432) (1984) (when plaintiff worked for painting company hired by Georgia Power to work on its

---

[3] Sinyard contends that Georgia Power's parent company, Southern Services Company, was "actually responsible for overseeing construction and maintenance activities" at Georgia Power plants during Sinyard's employment there. But Sinyard fails to cite anything in the record in support of this contention, so it fails. See *Harris*, 256 Ga. App. at 122 (2).

plant, Georgia Power was not a "principal contractor" under OCGA § 34-9-8 because it did not contract with another to perform work for another's benefit), with *Ramcke v. Ga. Power Co.*, 306 Ga. App. 736, 737–38 (1) (703 SE2d 13) (2010) (when there was no evidence that Georgia Power undertook a contractual obligation to perform work on the project for another, but merely hired another to perform the project work, Georgia Power was not a statutory employer).

Because Georgia Power was Sinyard's statutory employer for his work during construction of the new Units at Plants Scherer and Vogtle, the trial court correctly granted summary judgment to Georgia Power as to Sinyard's claims to the extent they seek recovery in connection with that specific work.

*2. Duty Issues*

By statute, property owners owe a duty to those invited onto their premises to "exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. The trial court concluded that Georgia Power did not owe this duty to Sinyard as a matter of law for three separate reasons: (a) Sinyard had equal knowledge of the risks of exposure to asbestos at the time; (b) the narrow "hired worker" exception relieved it of that duty; and (c) Georgia Power had relinquished control and possession of the premises to Sinyard's employers. Sinyard contends that issues of

21

material fact preclude summary judgment on each of these grounds. We address each in turn.

*(a) Superior Knowledge*

The "fundamental basis" for an owner or occupier's liability in premises-liability cases is the owner's "superior knowledge of the hazard encountered by the plaintiff." *Travis v. Quiktrip Corp.*, 339 Ga. App. 551, 553 (1) (794 SE2d 195) (2016) (citation and punctuation omitted). So, to recover on a premises liability claim, a plaintiff must show both that (1) the owner had "actual or constructive knowledge of the hazard" and (2) the plaintiff "lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier." *Travis*, 339 Ga. App. at 553 (1). See *Robinson v. Kroger Co.*, 268 Ga. 735, 748 (493 SE2d 403) (1997) (ordinarily, findings concerning relative negligence and knowledge of a hazard are the province of the jury). In assessing the relative knowledge of the parties, the question is whether they were accurately informed about the specific hazard or danger in question. See *St. Joseph's Hosp. of Atlanta, Inc. v. Hall*, 344 Ga. App. 1, 3 (806 SE2d 669) (2017) (concluding that owner lacked superior knowledge where hospital knew generally about hazards of ice but didn't know about the "specific invisible ice hazard" that caused a slip and fall);

22

*Fouch v. Bicknell Supply Co.*, 326 Ga. App. 863, 873 (2) (756 SE2d 682) (2014) (holding that jury question remained whether sandblaster was aware of the "specific risks" of using the defendant's products where he admitted that he knew of the "general risks" associated with sandblasting and that he was required to wear respiratory protection, but expert testified that small employers did not fully appreciate the risks of sandblasting and the potential for developing silicosis as a result of sandblasting, and that the plaintiff's supervisor wrongly believed that a respirator and mask were sufficient protection).

Here, the record is clear that Georgia Power knew at the time that asbestos material was present throughout its plants and that even brief exposure was harmful to human health. Georgia Power was aware that scientific literature from as early as 1973 showed that exposure to asbestos caused cancers such as mesothelioma, and that OSHA regulated asbestos usage as early as 1976. In 1981, Georgia Power also received material safety data sheets from John Crane—a manufacturer of gaskets used in Georgia Power's plants—about safely handling asbestos packing. As a result, Georgia Power trained its own union employees on the dangers of asbestos exposure and how to properly handle and dispose of asbestos, established internal procedures

23

for its own employees about working with asbestos, and gave its own employees respirators certified to protect against asbestos dust.

As for Sinyard's knowledge, we agree with him that there remains a genuine dispute of material fact whether he had actual or constructive knowledge of the "specific risks" caused by exposure to asbestos when he worked at Georgia Power. The evidence shows that Sinyard knew how to identify asbestos by the time he worked at Georgia Power, but there is a question of fact as to whether he had accurate knowledge of the specific risks of asbestos exposure. There is evidence that in 1978, when he was an apprentice, Sinyard was taught how to recognize asbestos and that he was supposed to wear an "Armstrong-style" paper mask—not a respirator—and to "wet it down" to minimize dust while he worked. But Sinyard testified that he had never worn a respirator mask or protective suits while working with asbestos. Nor had he ever had formal training from the union or at his job sites about how to identify and safely handle asbestos, or about the specific health hazards posed by even minimal exposure to asbestos dust. What he did learn, he learned "through the ranks" as he progressed later in his career.

There is further evidence from which a jury could conclude that neither Sinyard nor West, his direct supervisor with the Union, had knowledge equal to

24

Georgia Power's about the hidden dangers of asbestos during his tenure at Georgia Power plants—in particular, that exposure to asbestos particles in even small amounts is hazardous to human health and required specialized equipment and handling to protect workers. West testified that the union pipefitters lacked knowledge of the dangers posed by asbestos in the 1980s. West explained that although he knew asbestos was "bad for you" as early as the late 1970s, he "didn't realize it was so dangerous" or that it was a carcinogen until the late 1980s. Although Georgia Power's employees were provided respirators, Sinyard and West testified that they were instructed only to wear paper masks while working with asbestos. A jury could conclude based on this evidence that Georgia Power's knowledge of the specific risks of asbestos exposure was superior to Sinyard's. See *Fouch*, 326 Ga. App. at 872-73 (2). Compare *Law v. Chemtall, Inc.*, 342 Ga. App. 374, 377 (802 SE2d 408) (2017) (independent contractor deemed to have "full knowledge" of the potential chemical dangers from a tank farm where premises owner specifically warned independent contractor of such dangers by posting signs concerning the presence and dangers of sodium hydroxide and mandating that independent contractor provide safety training to its employees).

25

Georgia Power contends that Sinyard had actual or constructive knowledge of the specific risks posed by asbestos exposure because the national organization of his pipefitters union published occasional articles in a newsletter about the dangers of asbestos as early as the 1970s. For a number of reasons, we are not persuaded that the existence of those articles establishes actual or constructive knowledge as a matter of law. First, Sinyard was directly employed by local Union 72 and various contractors, not by the national union that published those articles. Second, there is no evidence that Sinyard was provided with copies of the UA Journal that were published prior to 1982; Georgia Power acknowledges that the articles they rely on "were published before Sinyard started work as a pipefitter in 1978." Third, a jury could reasonably conclude that he did not read newsletters sent to his house after that time, which he viewed as "junk mail." See, e.g., *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 175 (IV) (4th Cir. 2014) (mere existence of a NIOSH publication that was "disseminated through various means and . . . generally available" to defendant was insufficient to give rise to a duty based upon constructive knowledge to warn of bird manure and the risk of histoplasmosis). Fourth, there is some evidence that the contractors that Sinyard performed work under did not know about the specific risks of asbestos at the relevant time: West testified that the pipefitters were generally

26

unaware of such risks, and none of the contractors provided respirators or other protections to those working in the presence of asbestos. And finally, Sinyard testified that asbestos was not discussed at any of the local or national union meetings he attended. Given this evidence, we cannot conclude as a matter of law that the existence of a handful of articles in a national union newsletter gave Sinyard or his direct employers sufficient notice of the specific dangers posed by asbestos.

In sum, viewing the evidence and inferences that can be drawn from it in the light most favorable to Sinyard, there remains a genuine issue of material fact whether Georgia Power had superior knowledge of the specific dangers here. A jury could conclude that Sinyard had equal knowledge of those specific dangers, but we cannot say that it would be compelled to reach that conclusion as a matter of law. Compare *Fouch*, 326 Ga. App. at 873 (2), with *Williams v. Johnson*, 344 Ga. App. 311, 318 (1) (809 SE2d 839) (2018) (no issue of material fact existed as to whether plaintiff had equal knowledge of the hazards posed by mirror shards attached to a wooden board when he knew that glass is sharp and was aware of the specific risk that glass could cut him if handled improperly).

*(b) "Hired Worker" Exception*

Sinyard contends that the trial court also erred by concluding that Georgia Power owed no duty to Sinyard under the so-called "hired worker" exception. We agree. The hired worker exception is a narrow, specific "expression of the doctrine of assumption of [the] risk." *Carter v. Country Club of Roswell*, *Inc.*, 307 Ga. App. 342, 346 (705 SE2d 170) (2010). It can apply when the property is an "inherently and obviously unsafe area, such as a construction or demolition site, and the worker is hired to assist in the repair, construction, or demolition of the site." *Garcia v. KRC Alderwood Trails, LLC*, 348 Ga. App. 84, 89 (819 SE2d 713) (2018). Accord *Forest Cove Apts., LLC v. Wilson*, 333 Ga. App. 731, 735 (776 SE2d 664) (2015). But we have said that when the exception applies, it is because such a worker has "actual notice of the dangers associated with the work and has the opportunity to observe the situation and assess the risks for himself." Id. And we have stressed that the exception applies *as a matter of law* "only in clear and palpable cases, where it appears that a hired worker or independent contractor recklessly tests an observed and clearly obvious peril, or voluntarily assumes a position of imminent danger." Id. Here, as we just concluded, a question of material fact remains as to Sinyard's knowledge of the

28

specific dangers posed by asbestos exposure. That conclusion precludes summary judgment on this issue, too. *Garcia*, 348 Ga. App. at 90.

*(c) Relinquishment of Possession and Control*

The duty of care that property owners owe to their invitees does not extend to employees or invitees of an independent contractor hired to do work on the premises, if two conditions exist: (1) the owner "relinquished possession of the premises, in whole or in part," and (2) the owner "does not have the right and does not actually control or direct the work done." *McClure v. Equitable Real Estate Inv. Mgmt., Inc.*, 195 Ga. App. 54, 54 (392 SE2d 272) (1990). Accord *Campbell*, 360 Ga. App. at 424 (1). "Possession means 'having personal charge of or exercising the rights of management or control over the property in question,' and 'custody and control are the commonly accepted and generally understood incidents of possession.'" *West v. Briggs & Stratton Corp.*, 244 Ga. App. 840, 846 (536 S.E.2d 828) (2000).

Here, there is evidence from which a jury could conclude at least that Georgia Power did not relinquish possession of the relevant premises. West testified that "when you stepped on Georgia Power property, you were under their direction, what they told you, where you could work, what areas you could work in and where and what time you could do it." West explained that Georgia Power was "in control there

29

the whole time. . . they didn't turn it over to us, you know. They were there to make sure that it was done right." Georgia Power controlled when pipefitters and other contractors could access its plants. Georgia Power supervisors and inspectors were in charge of the areas where pipefitters worked, "watched us to make sure that we did it right," and inspected the final product. And every time the job specifications had to be changed to meet the demands of the job, West had to consult with Georgia Power supervisors and engineers before proceeding with the work. Finally, Georgia Power set safety rules that had to be followed, supervised and directed cleanup for all trades, provided and loaned tools to pipefitters, and had the authority to stop pipefitters from doing work.

Given this evidence, a genuine dispute of fact remains as to whether Georgia Power relinquished possession to the contractors that employed Sinyard. See *Johnson v. Kimberly Clark*, 233 Ga. App. 508, 510-511 (504 SE2d 536) (1998) (fact issue existed as to control of the premises because there was no evidence that the independent contractor had full and complete control of the premises where the work was being done). Compare *Ramcke*, 306 Ga. App. at 740 (3) ("The fact that the contract provided that [the owner] could inspect the work to ensure compliance with contract terms, or even stop the work if it was not in compliance, did not amount to

30

a right to control the time or manner of the work," and thus summary judgment for the owner was proper).

*3. Causation*

Causation is a necessary element of any premises-liability claim. *Walker v. Aderhold Props., Inc.*, 303 Ga. App. 710, 714 (2) (694 SE2d 119) (2010). For asbestos-exposure cases, the "threshold" question is whether "an injured plaintiff was exposed to asbestos-containing products for which the defendant is responsible." *Hoffman v. AC&S, Inc.*, 248 Ga. App. 608, 611 (2) (548 SE2d 379) (2001) (punctuation and footnote omitted). To survive summary judgment in such a case, a plaintiff must present evidence from which a jury could conclude that he was exposed to "defendant's asbestos-containing product . . . at the job site and that the plaintiff was in proximity to that product at the time it was being used." Id. (footnote and punctuation omitted). To meet this burden, a plaintiff may provide testimony establishing these facts from personal knowledge or offer "testimony of co-workers who can identify [the] plaintiff by name as having worked with or around a particular defendant's asbestos-containing products." Id. (footnote and punctuation omitted). But "[g]uesses or speculation which raise merely a conjecture or possibility are not

31

sufficient to create even an inference of fact for consideration on summary judgment." Id. (footnote and punctuation omitted).

Here, Sinyard's own testimony creates an issue of material fact as to whether he was exposed to asbestos-containing products while working at Georgia Power facilities. Sinyard testified that while doing maintenance at Plant McDonough during plant shutdowns, he worked next to the boiler and had "to tear the insulation and stuff all around the boiler" and related piping systems. Sinyard testified that when doing this work, he installed valves manufactured by Crane and Honeywell and pumps manufactured by Ingersoll Rand, among others. Sinyard also specifically remembered putting packings in Garlock brand pumps and removing Garlock brand gaskets while at Plant McDonough. There is evidence that Georgia Power used asbestos-containing valves, gaskets and pumps manufactured by these brands. Sinyard explained that the installation of these new valves and pumps involved "cutting in factory gaskets . . . to order, installing the valve" and "making sure all [the insulation] packings are tight." This work created dust that he would breathe in. Sinyard testified that he believed these products contained asbestos because of his "years of experience going back and looking at what I know and knowing what [asbestos] looks like." Sinyard also explained that he believes he was exposed to asbestos while breathing in dusty

air at the plant because it "was present at the time" and that he "believ[ed]" that the dusty air present in the plant contained asbestos because it had a "fibrous material" that he recognized as asbestos.

The testimony of Eugene West, one of Sinyard's union supervisors at Plant Branch and Scherer, adds to the evidence from which a jury could conclude that Sinyard was exposed to asbestos while working at Georgia Power facilities. West testified that he was a supervising general foreman at the Georgia Power projects. He often directly supervised Sinyard during maintenance work done during plant shut-downs. West testified that the primary brands of valves present at the Georgia Power plants were Honeywell, Crane, and Ingersoll Rand. And he testified not only that Sinyard "probably" worked on Honeywell brand valves during plant shutdowns because there were so many Honeywell brand valves present at the worksite, but also that Sinyard's job duties would have been to install Honeywell brand valves. Compare *Hoffman*, 248 Ga. App. at 611-12 (2) (testimony that a plaintiff's former coworker believed Armstrong-brand insulation was used "in the sixties" was too speculative to prove that the product was used at the shipyard during the three-month span of plaintiff's employment there).

33

All told, the above evidence—from Sinyard's identification of brands of pumps, gaskets, valves, and insulation that he worked with while at Georgia Power facilities and his identification of asbestos based on his later knowledge of what it looks like, to West's testimony about Sinyard's work—is enough to create an issue of material fact as to whether Sinyard was exposed to asbestos while working at Georgia Power facilities. See *Ga. Power Co. v. Campbell*, 360 Ga. App. 422, 427-28 (2) (a) (861 SE2d 255) (2021) (plaintiff met his burden to show asbestos products were used in a workplace by his own testimony that he worked "with boxes of insulation [that] were marked as containing asbestos"); *John Crane, Inc. v. Wommack*, 227 Ga. App. 538, 541-42 (3) (489 SE2d 527) (1997) (plaintiff's testimony that "I feel sure that I did" when asked if he removed Crane asbestos packing was not speculative opinion testimony when combined with other testimony that he knew he was using Crane's packing because Crane's name was on the packaging). Compare A*damson v. Gen. Elec. Co.*, 303 Ga. App. 741, 744-45 (3) (a) (694 SE2d 363) (2010) (although there was evidence that asbestos-containing materials were present at a worksite while decedent worked there, summary judgment for defendant was proper because there was no evidence showing that the decedent "was ever in proximity to any asbestos-containing gaskets or packing material

34

manufactured" by defendant); *Williams v. Flintkote Co.*, 256 Ga. App. 205, 207 (2) (a) (568 SE2d 106) (2002) (summary judgment to defendant was appropriate when testimony established only that its asbestos-containing products were used somewhere within two plants but not that plaintiffs were in proximity to those products).

*4. Statute of Repose*

OCGA § 9-3-51 provides that any action to recover for damages arising out of a deficiency in the construction of an improvement to real property must be brought against a person performing the construction within eight years after "substantial completion of such an improvement." But even assuming this statute of repose applies to Sinyard's work as a pipefitter for Georgia Power, see *Ga. Power Co. v. Campbell*, 360 Ga. App. 422, 427-28 (2) (a) (861 SE2d 255) (2021) (noting "no dispute that the [asbestos] insulation work at issue ... constituted 'an improvement to real property'"), this defense may not be asserted by someone in "actual possession or control" of the improvement at the time of the injury. OCGA § 9-3-52; see also OCGA § 9-3-50 (1) ("person" includes corporations and partnerships). For this reason, the same issue of material fact identified in Division 3 (c)—whether Georgia

35

Power relinquished possession and control of the premises where Sinyard worked—also precludes summary judgment on the statute of repose.

*Case No. A21A1425. Sinyard et al. v. Ford Motor Company*.

In Case No. A21A1425, Sinyard appeals from the trial court's grant of summary judgment to Ford Motor Company. Sinyard's claims against Ford are based on Ford's alleged negligence in failing to properly maintain its premises and in failing to provide sufficient warnings about the presence of asbestos in its facilities and the dangers posed by exposure to asbestos during his employment at its plant between 1981 to 1995. He contends that the trial court erred in concluding that Ford did not owe a duty of care as the premises owner to Sinyard because (1) Sinyard had equal knowledge of the hazards posed by asbestos, and (2) Ford had relinquished possession and control over the portion of the plant where Sinyard worked. We conclude that material issues of fact preclude summary judgment on each of these grounds.

5. *Superior Knowledge*

As we explained in Division 2 (a), an owner or occupier's liability in premises-liability cases is grounded in the owner's superior knowledge of the specific hazard at issue. *Travis* 339 Ga. App. at 553 (1) (citation and punctuation omitted); *Fouch*

36

*Supply Co.,* 326 Ga. App. at 873 (2). Again, establishing the owner's superior knowledge requires proof that (1) the owner had actual or constructive knowledge of the specific hazard and (2) the plaintiff lacked such knowledge despite exercising ordinary care. *Travis*, 339 Ga. App. at 553 (1); *Fouch*, 326 Ga. App. at 873. A genuine dispute of material fact on both of these issues precludes summary judgment. See *Brownlee v. Winn-Dixie Atlanta, Inc.*, 240 Ga. App. 368, 369 (2) (523 SE2d 596) (1999) (whether a premises owner had "superior knowledge [of a hazard] is generally an issue for the jury").

As with Georgia Power, the record is clear that Ford knew about the specific dangers of asbestos exposure at the relevant times. It is undisputed that Ford knew as early as 1972 that its plant was built with asbestos materials and that asbestos posed a hazard to human health. Ford was aware that there was medical research showing that even a single day's exposure to asbestos could cause a person to develop cancer. By 1973, Ford developed its own formal policies and procedures for its employees relating to the safe handling of asbestos. In 1980, Ford sent a communication to all of its assembly plant Engineering Managers which stated that asbestos was a known human carcinogen and that "[a] potential hazard exists whenever asbestos is cut,

37

ripped, drilled, ground, or handled in any way that causes dust to become airborne."

.

As for Sinyard, there is enough evidence here to create a genuine dispute of material fact as to whether Sinyard was aware of the specific health hazards posed by working with asbestos and the presence and location of asbestos in Ford's Hapeville plant. As we explained in detail in Division 2 (a) with respect to Sinyard's work at Georgia Power—also in the 1980s—the evidence shows that Sinyard knew how to identify asbestos at the relevant times, but there is a question of fact as to whether he had accurate knowledge of the specific risks of asbestos exposure. The same evidence that we recounted there—Sinyard's gaps in knowledge of the specific dangers of inhaling even small amount of asbestos and how to properly protect himself; his employers' and supervisors' similar deficiencies; and the likelihood that neither he nor his employers acquired sufficient knowledge through a handful of newsletters by the National Union—could allow a jury to conclude that Sinyard had equal knowledge of the specific dangers posed by exposure to asbestos. And Ford points to no evidence that it posted any labels identifying asbestos materials or warning of the dangers of asbestos in its plant, or that it directly warned Sinyard or his employers of these dangers. See *Bagley*, 219 Ga. App. at 545 (to prove that railroad negligently

38

failed to warn plaintiff of dangers of asbestos, plaintiff was "required to prove that [the railroad] knew or should have known that his exposure to asbestos dust placed him at risk for contracting asbestosis, yet failed to inform and protect him").

In sum, viewing the evidence and inferences that can be drawn from it in the light most favorable to Sinyard, there remains a genuine issue of material fact whether Ford had superior knowledge of the specific dangers here. As with his work at Georgia Power plants, a jury could conclude that Sinyard did not have equal knowledge of those specific dangers when he worked at Ford plants.

*6. Relinquishment of Possession and Control*

We also explained in Division 2 (b) that the duty of care that property owners owe to their invitees does not extend to employees or invitees of an independent contractor hired to do work on the premises, if two conditions exist: (1) the owner "relinquished possession of the premises, in whole or in part," and (2) the owner "does not have the right and does not actually control or direct the work done." *McClure*, 195 Ga. App. at 54. Accord *Campbell*, 360 Ga. App. at 424 (1). "Possession means 'having personal charge of or exercising the rights of management or control over the property in question,' and 'custody and control are the commonly accepted and generally understood incidents of possession.'" *West,* 244 Ga. App. at 846.

39

There is at least an issue of fact as to whether Ford relinquished possession or control of the portion of the plant where Sinyard was working for Cleveland Consolidated in 1981 through 1985 and for Mann Mechanical in 1986. Possession "implies the ability to control access to the premises and to exclude others therefrom." *Mullinax v. Pilgrim's Pride Corp.*, 354 Ga. App. 186, 198 (3) (b) (840 SE2d 666) (2020) (citation and punctuation omitted). Neither party has identified a contract for the work Sinyard performed at the Hapeville plant during these times. However, Sinyard testified that when he performed fill-in maintenance work at the Hapeville plant between 1981 and 1985, he worked under the direct supervision of Ford employees, he worked with a Ford crew or one of its pipefitters on shift, and he used tools and maintenance materials provided by Ford. Sinyard further testified that other tradespeople had access to the areas of the plant when he performed this work.

Ford points to the testimony of its representative about the process by which Ford typically hired outside contractors to work at the plant. The representative testified that although he did not have exact knowledge of Sinyard's working conditions during this period, it was unlikely that Sinyard would have worked at the direction of Ford employees or used Ford-provided materials because Ford had its own union maintenance personnel and would only bring in outside contractors for

regular maintenance if no UAW-union pipefitters were available to perform the work. The representative agreed, however, that it was not outside the realm of possibility that Sinyard and his employers operated differently. Ford also points to Sinyard's testimony that he was, on certain occasions, supervised by his employer while working at the Ford plant.

Given this evidence, a genuine dispute of fact remains as to whether Georgia Power relinquished possession of the premises to Cleveland Consolidated or Mann Mechanical and as to whether Georgia Power directed the work done by Sinyard. See *Campbell*, 360 Ga. App. at 425-26 (1) (issue of material fact existed as to whether nuclear power plant relinquished possession of the premises and control of the insulation work to independent contractor); *Mullinax*, 354 Ga. App. at 198 (3) (b) (issue of fact precluded summary judgment where premises owner identified no evidence showing that he surrendered the ability to exclude others from portion of the premises in which decedent was injured). Compare *Ramcke*, 306 Ga. App. at 739-40 (3) (property owners had no duty to keep work premises safe for construction company's invitees when property owners surrendered possession and control of

project premises to construction company to perform work as independent contractor).

*A21A1426. Sinyard et al. v. Piedmont Hospital, Inc.*

In Case No. A21A1426, Sinyard appeals from the trial court's grant of summary judgment to Piedmont Hospital. Sinyard's claims against Piedmont are based on Piedmont's alleged negligence in failing to properly maintain its premises and in failing to provide sufficient warnings as to the presence of asbestos on its premises as well as the dangers it posed to those exposed to it during Sinyard's employment at its premises from 1986 to 1989. He contends that the trial court erred in concluding that Piedmont did not owe a duty of care as the premises owner to Sinyard because (1) Sinyard had equal knowledge of the hazards posed by asbestos, and (2) Piedmont had relinquished possession and control over the portion of the plant where Sinyard worked. We conclude that the trial court properly granted summary judgment on the ground that McKenney's—Sinyard's employing contractor—had equal knowledge of the specific hazards of asbestos and its presence at Piedmont.

*7. Superior Knowledge*

As we explained in Division 2 (a), an owner or occupier's liability in premises-liability cases is grounded in the owner's superior knowledge of the specific hazard at issue. *Travis*, 339 Ga. App. at 553 (1) (citation and punctuation omitted); *Fouch,* 326 Ga. App. at 873 (2). Again, establishing the owner's superior knowledge requires proof that (1) the owner had actual or constructive knowledge of the specific hazard and (2) the plaintiff lacked such knowledge despite exercising ordinary care. *Travis*, 339 Ga. App. at 553 (1); *Fouch*, 326 Ga. App. at 873. A genuine dispute of material fact on both of these issues precludes summary judgment. *Travis,* 339 Ga. App. at app 556 (1).

With respect to Piedmont's knowledge when Sinyard worked there, the evidence shows that Piedmont did have knowledge that its hospital contained asbestos, and that OSHA regulated asbestos and had identified it as a carcinogen, and that it had been directed by the Georgia Department of Natural Resources to post warning signs and maintain proper building records to note the presence of asbestos in its facility. However, unlike Georgia Power or Ford, there is no evidence that Piedmont had internal policies addressing the handling of and exposure to asbestos

or that Piedmont trained its employees about safe handling of asbestos.[4] Further, Sinyard has pointed to no evidence that Piedmont was aware of the procedures—such as the use of respirators and safe disposal—that should be used to safely work with asbestos.

As for Sinyard's knowledge, the undisputed evidence shows that McKenney's, Sinyard's contracting employer, had knowledge equal to that of Piedmont regarding the presence of asbestos and its dangers at the time of Sinyard's employment at Piedmont. In the 1980s, McKenney's knew that hospitals, such as Piedmont, contained asbestos materials. McKenney's representative testified that McKenney's was "part of the industry and the industry is aware of asbestos and its presence. And that's why you have procedure to handle it." McKenney's representative testified that, in the 1980s, it was aware that its workers would encounter asbestos when they worked in Piedmont's building. He further testified that the company's "awareness

---

[4] Sinyard argues that Piedmont should be deemed to have constructive knowledge of the health hazards posed by exposure to asbestos because it had access to medical doctors and scientific literature available in its own medical library and through the Atlanta Health Science Libraries Consortium. However, Sinyard fails to identify specific articles that the hospital should have been aware of. See *Houschar*, 739 F.3d at 175 (IV) (power company that owned and operated site where it knew birds congregated could not be deemed to have constructive knowledge of articles on government website related to the connection between exposure to bird manure and histoplasmosis).

[that] asbestos has been a problem [has] evolved over many, many, many years, probably starting as early as the '70s and all the way through when OSHA wrote a procedure in 1994." Although the representative could not identify written procedures the company created for dealing with asbestos in the 1980s, he believed that the company provided its employees with paper masks to wear while working with asbestos and that, as early as the 1970s, it would have trained its workers on how to detect asbestos. He explained that in the 1980s and 1990s, McKenney's had several "solutions" available to it when a worker detected asbestos: it could direct its workers to wear masks and reduce exposure to dust while working with it, it could tell the premises owner to handle it, or it could hire a subcontractor to abate it. See *McKinney*, 284 Ga. App. at 253 (1) (summary judgment for premises owner was appropriate because any duty the premises owner had to warn independent contractor's employee of a buried electrical line was satisfied by notice to his supervisor).

Based on the above, Sinyard's employing contractor had at least equal knowledge of the specific hazard posed by exposure to asbestos at Piedmont. And "[f]ull knowledge by the independent contractor of the dangers" is sufficient to discharge the landowner's duty to its invitees. *Douberly v. Okefenokee Rural Elec.*

45

*Membership Corp.*, 146 Ga. App. 568, 570 (246 SE2d 708) (1978) (because there was evidence that logger's employer had knowledge of the location and existence of power line that injured him, the landowner had no duty to warn the logger). Thus, the trial court did not err in granting summary judgment in favor of Piedmont on this ground. See *Odister v. Leach*, 257 Ga. App. 106, 108 (570 SE2d 391) (2002) (summary judgment correctly granted to premises owner when evidence did not show that premises owner had superior knowledge of dangers associated with task); *Douberly,* 146 Ga. App. at 569 (2) (although injured employee denied that the warning provided by the premises owner to his employer was relayed to him, "this issue is neither relevant nor material to the issue of" the premises owner's duty to the employee).[5]

*Judgment affirmed in part and reversed in part in Case No. A21A1424, judgment reversed in Case No. A21A1425, and judgment affirmed in Case No. A21A1426. Dillard, P. J., and Mercier, J., concur*.

---

[5] As a result of our holding in Division 7, we need not address Sinyard's remaining enumerations of error in this case.